WALTER N. LATIMER *v.* ADMINISTRATOR, UNEMPLOY-MENT COMPENSATION ACT
(13863)

PETERS, C. J., SHEA, CALLAHAN, COVELLO and HULL, Js.

Argued May 3—decision released August 14, 1990

*Brian McCormick,* for the appellant (plaintiff).

*Thadd A. Gnocchi,* assistant attorney general, with whom, on the brief, were *Clarine Nardi Riddle,* attorney general, and *Charles A. Overend,* assistant attorney general, for the appellee (defendant).

CALLAHAN, J. This is an appeal from an assessment by the defendant administrator[1] of the Connecticut Unemployment Compensation Act pursuant to General Statutes § 31-270[2] for unpaid contributions allegedly

---

[1] The administrator of the Connecticut Unemployment Compensation Act is presently Betty L. Tianti.

[2] "[General Statutes] Sec. 31-270. FAILURE OF EMPLOYER TO FILE REPORT OF CONTRIBUTIONS DUE. APPEAL FROM ACTION OF ADMINISTRATOR. If an employer fails to file a report for the purpose of determining the amount of contributions due under this chapter, or if such report when filed is incorrect or insufficient and the employer fails to file a corrected or sufficient report within twenty days after the administrator has requried the same by written notice, the administrator shall determine the amount of contribution due, with interest thereon pursuant to section 31-265, from such employer on the basis of such information as he may be able to obtain and he shall give written notice of such determination to the employer. Such determination shall be made not later than three years subsequent to the date such contributions became payable and shall finally fix the amount of contribution unless the employer, within thirty days after the giving of such notice, appeals to the superior court for the judicial district of Hartford-New Britain or for the judicial district in which the employer's principal place of business is located. Said court shall give notice of a time and place of hearing thereon to the administrator. At such hearing the court may confirm or correct the action of the administrator. If the action of the administrator is confirmed or the amount of the contribution determined by the administrator is increased, the cost of such proceedings, as in civil actions, shall be assessed against the employer. No costs shall be assessed against the state on such appeal. The amount of any judgment rendered in such proceedings, with costs, shall be collected either on execution, as provided in civil actions, or as provided in section 31-266."

due under the act from the plaintiff, Walter N. Latimer. The assessment was based on a determination by the administrator that the plaintiff was the employer, within the meaning of General Statutes § 31-222 (a) (1) (B) (ii), of certain individuals who rendered services to him in his home during the first two calendar quarters of 1987.[3] The plaintiff claimed, to the contrary, that the subject individuals were independent contractors, not his employees, and that he is not liable for any contributions under the act.

On December 14, 1987, the plaintiff filed an appeal from the assessment to the Superior Court pursuant to § 31-270. After the appeal was filed, the plaintiff and the administrator entered into an agreement that allowed the plaintiff the opportunity to present factual claims and legal arguments directly to the administrator in writing. Following the written submission the plaintiff and the administrator agreed that an evidentiary hearing should be held.[4] Pursuant to this agreement a hearing was held on May 23, 1988, before a hearing officer appointed by the administrator. Subsequent to the hearing, additional written arguments were submitted to the hearing officer by both parties.

Thereafter, the hearing officer rendered a decision determining that the plaintiff had failed to show that the persons providing him services were free from his control and direction in connection with their performance of those services. The hearing officer concluded, therefore, that those persons furnishing services to the plaintiff were his employees, not independent contractors, and that the plaintiff was liable for the amount assessed by the administrator.[5] See General Statutes

[3] The amount of the assessment together with penalties and interest was $291.31.

[4] General Statutes § 31-270 does not mandate an administrative hearing.

[5] The plaintiff does not contest the method of computation of the assessment or the amount thereof.

§ 31-222 (a) (1) (B) (ii) (I). The trial court upheld the hearing officer's decision albeit upon a different ground from that relied on by the hearing officer.[6]

In connection with the administrative hearing afforded the plaintiff, the hearing officer made an extensive and detailed finding of facts. That finding is not disputed by the parties. Its relevant portions are summarized herein and it is printed in its entirety in the footnote below.[7] The hearing officer found that the

[6] The trial court, in its memorandum of decision, noted that it had a "reservation" as to whether the hearing officer was correct in determining under General Statutes § 31-222 (a) (1) (B) (ii) (I) that the plaintiff had failed to show that the individuals rendering services to him were free from his control and direction. The trial court decided, however, that the record supported a conclusion that the plaintiff had failed to demonstrate under § 31-222 (a) (1) (B) (ii) (II) that the services rendered to the plaintiff were performed either outside the usual course of the business for which they were performed or performed outside of all the places of business of the enterprise for which the services were performed. It consequently upheld the administrator's assessment on that alternative ground. We disagree with the trial court's "reservation" concerning the hearing officer's decision and do not comment on the application of § 31-222 (a) (1) (B) (ii) (II) to these facts. We simply conclude, on the basis of the facts developed on the record, that the hearing officer's decision under § 31-222 (a) (1) (B) (ii) (I) was not unreasonable, arbitrary, or illegal.

[7] The hearing officer found that:

"(1) Walter N. Latimer, the appellant is 88 years old and suffered a stroke in March, [1987].

"(2) Following his stroke, the appellant was hospitalized at Charlotte Hungerford Hospital in Torrington for approximately three weeks.

"(3) As a result of the stroke, appellant's right side became partially paralyzed, requiring the use of a walker and a wheelchair.

"(4) Following his period of hospitalization at Charlotte Hungerford Hospital, the appellant was admitted to Gaylord Hospital in Wallingford for rehabilitative therapy.

"(5) The appellant was discharged from Gaylord Hospital and returned to his home on or about June 1, 1987.

"(6) Due to his physical limitations, the appellant is and has been unable to manage his day-to-day affairs. The appellant's day-to-day affairs have been handled by his attorney-in-fact, George Christian, under a general power of attorney granted to him by the appellant on April 4, 1984.

"(7) Prior to the appellant's discharge from Gaylord Hospital, Mr. Christian discussed the appellant's needs with the appellant's physician, Dr. Frank

plaintiff was eighty-eight years old when he suffered
a stroke in March, 1987. Following a period of hospitali-
zation at Charlotte Hungerford Hospital, and a period
of rehabilitation therapy at Gaylord Hospital, the plain-

Vanoni of Torrington. Dr. Vanoni indicated that the appellant should either
be placed in a nursing home or receive round-the-clock nursing care in his
home, because he was incapable of independent living.

"(8) Mr. Christian contacted Carol Johnson, president of the Litchfield
Hills Nurses Registry (hereinafter 'Nurses Registry') and requested that
the Nurses Registry provide to the appellant individuals who would pro-
vide the level of care and assistance needed by the appellant on a day-to-
day basis.

"(9) In response to Mr. Christian's request, personal care assistants
(PCA's) were provided to the appellant and placed in the appellant's home
by the Nurses Registry. Although PCA's are assigned to provide care which
is temporary or for an indefinite period of time (i.e. so long as it is needed),
the Nurses Registry prepares a 6 week schedule, which can be adjusted
as the client's needs change. The PCA's indicate to the Registry the par-
ticular days and hours for which they are available for work. They offer
their services to the general public through the Nurses Registry and in some
cases by advertising their services independently of the Nurses Registry.
Many of the PCA's are registered to work with more than one Nurses Regis-
try. The PCA's placed by the Nurses Registry in the appellant's home sign
a Nurses Registry Client Agreement which states that '(t)he Registry mem-
ber is an independent contractor unless otherwise employed directly by the
Registry Client.'

"(10) Appellant was initially provided with 24 hour care per day for approx-
imately 11 weeks. As he progressed in his rehabilitation, care was reduced
to 12 hours per day and then reduced again to 8 hours of care per day.
Currently PCA's are provided 6 days a week, with Mr. Latimer being given
'alone time' on Sundays, when family members, friends and Mr. Christian
call on him. Although there is not a PCA on duty on Sunday, Mr. Latimer
is not actually alone as he has the services of Communicare, which allows
him to seek assistance immediately if he is having problems.

"(11) The specific PCA provided to appellant is selected by the Nurses
Registry, although the Registry's client can communicate a preference for
or objection to a particular PCA selected by the Registry. During the course
of appellant's rehabilitation at home, twelve different PCA's have been pro-
vided to the appellant by the Nurses Registry.

"(12) The Nurses Registry has provided twelve different PCA's to the
appellant since June of 1987. Each of the PCA's is either a Certified Nurse's
Aide, a Certified Home Health Aide or has prior experience working as
a nurses' aide. Each Certified Nurse's Aide has undergone a certain num-
ber of hours of training in a nursing home under the supervision of a regis-

tiff returned to his home on June 1, 1987. Due to physical limitations resulting from his stroke, he was unable thereafter to manage his day-to-day affairs. His affairs, therefore, were attended to by George Christian, his attorney-in-fact, under a general power of appointment given to Christian by the plaintiff on April 4, 1984.

Prior to the plaintiff's discharge from Gaylord Hospital his personal physician, Frank Vanoni, informed Christian that the plaintiff should either be placed in a nursing facility or receive twenty-four hour care at home because he was incapable of independent living.

tered nurse. Each Certified Home Health Aide has undergone a certain number of hours of training in a licensed home health care agency under the supervision of a registered nurse.

"(13) Each PCA who has performed services for the appellant, Mr. Latimer, has been trained to assist patients in activity guidance, including taking medicine on a regular schedule, assisting patients toward ambulation, bathing, dressing, feeding, assistance with therapy and meal planning. The particular services Mr. Latimer required of each PCA included bathing, dressing, breakfast preparation, regular dispensing of medications, assistance toward ambulation including safe use of a walker and wheelchair, errands including occasionally driving Mr. Latimer's car and any other assistance in daily living activities which Mr. Latimer is incapable of managing on his own. With respect to meal preparation, each PCA is required to be cognizant of a medically-imposed salt restriction on Mr. Latimer's diet. In addition, there was an initial concern regarding the risk of choking, since Mr. Latimer's stroke had resulted in a numbed gag reflex. Most of the PCA's assigned to perform services for Mr. Latimer had some level of training in resuscitation techniques. PCA's are not required to perform cleaning, laundry or grocery shopping.

"(14) The requisite level of skill and training required of PCA's performing services for Mr. Latimer was determined by the Nurses Registry, based upon recommendations made by Mr. Latimer's personal physician, Dr. Frank Vanoni.

"(15) Pursuant to the procedure established by the Nurses Registry, the PCA is paid by the appellant, Mr. Latimer through his attorney-in-fact, a Mr. Christian upon presentation of an invoice. The PCA[s] may utilize billing forms provided to them by the Nurses Registry which identify them as . . . member[s] of the Litchfield Hills Nurses Registry. Prior to May 9, 1988, the PCA paid a portion of his or her fee to the Registry. As of May 9, 1988, the procedure was changed by the Registry so that the PCA now

In response, Christian contacted Carol Johnson, the president of the Litchfield Hills Nurses Registry (registry), and requested that she provide home health aides to the plaintiff in order to furnish him with the level of care and assistance he needed on a daily basis.

Pursuant to Christian's request, personal care assistants (PCAs) were supplied by the registry and placed in the plaintiff's home. The PCAs placed with the plaintiff were either certified nurse's aides, certified home health aides, or had had prior experience working as nurse's aides. They offered their services to the general public through the registry and in some instances were enrolled with more than one registry and also

bills the client directly and the Registry also bills the client directly. While there are hourly rates set by the Registry for the services provided by the PCA's, the rates are actually negotiable, although generally the rates set by the Registry are the minimum rates charged to clients by the Registry and its members. The Registry now bills the client directly for its scheduling services at a rate of $1.75 per hour. The 'Schedule of Rates and Fees' as well as the 'Client Agreement' utilized by the Nurses Registry are items which are submitted to, reviewed by and approved by the State of Connecticut Department of Labor, Working Conditions Division of Occupational Safety and Health.

"(16) The PCA's report their day-to-day activities to Mr. Christian who does not actively direct the performance of their duties, but monitors the care given to Mr. Latimer.

"(17) The appellant, through his attorney-in-fact, issued a Form 1096 to each of the PCA's who performed services for Mr. Latimer during 1987, which listed all remuneration paid to the PCA as 'non-employee compensation.' The appellant treated each of the PCA's as an independent contractor for federal income tax purposes.

"(18) Neither the appellant nor the Nurses Registry accepted responsibility for Social Security taxes, personal or professional liability insurance, malpractice liability insurance, workers compensation insurance or individual life, health or disability insurance.

"(19) The appellant, through his attorney-in-fact retained the right to discharge any PCA. The Nurses Registry recognizes that the appellant or any client may directly communicate to a PCA that his services are no longer needed, although it would encourage the appellant or any client to inform the Nurses Registry when it takes such an action, in order to preclude further billing by the Registry with respect to that individual PCA."

advertised their services independently. The plaintiff was initially provided with twenty-four hour care for seven days per week, but his care was gradually reduced to eight hours per day for six days per week.

In accordance with the procedures established by the registry, the PCAs were paid at an agreed hourly rate directly by the plaintiff acting through his attorney-in-fact, Christian.[8] Christian, thereafter, issued an Internal Revenue Service form 1096 to each of the PCAs who performed services for, and were paid by, the plaintiff during 1987. That form listed all remunerations to the PCAs as "non employee compensation." The plaintiff also treated the PCAs as independent contractors for federal income tax purposes and neither the plaintiff nor the registry assumed any responsibility for social security taxes, personal or professional liability insurance or individual life, health or disability insurance. Furthermore, each PCA placed with the plaintiff by the registry signed an agreement with the registry that he or she "is an independent contractor unless otherwise employed directly by the Registry Client."

The hearing officer also found that the plaintiff, through his attorney-in-fact, retained the right to discharge any PCA and that the registry acknowledged that the plaintiff, or any client of the registry, could communicate to any PCA at any time that the PCA's services were no longer needed. Moreover, the hearing officer found that although Christian did not directly supervise the performance of the PCAs' duties, the PCAs did report their day-to-day activities to him and he monitored the care given the plaintiff. The trial court rendered its decision on the appeal after

---

[8] Hourly rates were set by the registry for the PCAs' services. Those rates, however, were actually negotiable.

reviewing the findings of fact and the record submitted by the hearing officer.[9]

The Unemployment Compensation Act (act) defines employment in General Statutes § 31-222 (a) (1) (A) and (B).[10] Besides codifying the common law rules used

[9] The plaintiff, although he does not dispute the facts found, argues that the trial court erred in not conducting a de novo review of the administrator's action without regard to the record developed before the hearing officer. The scope of review in an appeal from an assessment of unemployment tax contributions under General Statutes § 31-270 is less than clear. See *Beaverdale Memorial Park, Inc.* v. *Danaher,* 127 Conn. 175, 181–83, 15 A.2d 17 (1940); *Ogozalek* v. *Administrator,* 22 Conn. Sup. 100, 101, 163 A.2d 114 (1960). In this instance, however, the trial court was warranted in reviewing the record to determine whether the administrator's conclusion, assessing contributions against the plaintiff, was unreasonable, arbitrary or illegal. See *All Brand Importers, Inc.* v. *Department of Liquor Control,* 213 Conn. 184, 192, 569 A.2d 1156 (1989). Although not provided by statute, the parties agreed to an elaborate procedural arrangement that contemplated and resulted in a full scale hearing before a hearing officer with a resultant finding of facts and a decision. To ignore the finding of facts and the conclusion of the hearing officer and to treat this appeal as a de novo proceeding would defy common sense and go against the grain of what the parties obviously intended. See General Statutes § 4-183. The trial court did not err by restricting its review to the record developed at the administrative hearing.

[10] General Statutes § 31-222 (a) (1) (A) and (B) provide: "DEFINITIONS. As used in this chapter, unless the context clearly indicates otherwise:

"(a) (1) 'Employment', subject to the other provisions of this subsection, means:

"(A) Any service, including service in interstate commerce, and service outside the United States, performed under any express or implied contract of hire creating the relationship of employer and employee;

"(B) Any service performed prior to January 1, 1978, which was employment as defined in this subsection prior to such date and, subject to the other provisions of this subsection, service performed after December 31, 1977, including service in interstate commerce, by any of the following: (i) Any officer of a corporation; (ii) any individual who, under either common law rules applicable in determining the employer-employee relationship or under the provisions of this subsection, has the status of an employee. Service performed by an individual shall be deemed to be employment subject to this chapter irrespective of whether the common law relationship of master and servant exist, unless and until it is shown to the satisfaction of the administrator that (I) such individual has been and will continue to

to determine the existence of an employer-employee relationship, the act was amended in 1971 to include the use of what is popularly known in Connecticut and throughout the country in similar legislation as the "ABC test." The ABC test is utilized to ascertain whether an employer-employee relationship exists under the act. The ABC test is embodied in subdivisions (I), (II) and (III) of § 31-222 (a) (1) (B) (ii). *F.A.S. International, Inc.* v. *Reilly,* 179 Conn. 507, 511, 427 A.2d 392 (1980). In order to demonstrate that he is not an employer and therefore has no liability for unemployment taxes under the act, a recipient of services must show that he has satisfied the criteria necessary to establish nonliability under all three prongs of the

be free from control and direction in connection with the performance of such service, both under his contract for the performance of service and in fact; and (II) such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and (III) such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed; (iii) any individual other than an individual who is an employee under clause (i) or (ii) who performs services for remuneration for any person (I) as an agent-driver or commission driver engaged in distributing meat products, vegetable products, fruit products, bakery products, beverages, other than milk, or laundry or dry-cleaning services, for his principal; (II) as a traveling or city salesman, other than as an agent-driver or commission-driver, engaged upon a full-time basis in the solicitation on behalf of, and the transmission to, his principal, except for sideline sales activities on behalf of some other person, of orders from wholesalers, retailers, contractors, or operators of hotels, restaurants or other similar establishments for merchandise for resale or supplies for use in their business operations; provided, for purposes of subparagraph (B) (iii), the term 'employment' shall include services described in clause (I) and (II) above performed after December 31, 1971, if 1. the contract of service contemplates that substantially all of the services are to be performed personally by such individual; 2. the individual does not have a substantial investment in facilities used in connection with the performance of the services, other than in facilities for transportation; and 3. the services are not in the nature of a single transaction that is not part of a continuing relationship with the person for whom the services are performed."

ABC test. Id.; *State Department of Labor* v. *Medical Placement Services, Inc.,* 457 A.2d 382, 385–86 (Del. Super. 1982), aff'd, 467 A.2d 454 (Del. 1983); *Unemployment Ins. Tax Contribution* v. *Friedrichs,* 233 Mont. 384, 760 P.2d 93 (1988); *Nielsen* v. *Department of Employment Security,* 692 P.2d 774, 776 (Utah 1984) "The test is conjunctive; all parts must be satisfied to exclude an employer from the Act." *Gay Hill Field Service* v. *Board of Review,* 750 P.2d 606, 608 (Utah App. 1988); *Appeal of Work-A-Day of Nashua, Inc.,* 132 N.H. 289, 564 A.2d 445 (1989).

Under the ABC test any service provided by an individual is considered employment, unless and until the recipient of the services provided has sustained the burden of showing "to the satisfaction of the administrator that (I) such individual has been and will continue to be free from control and direction in connection with the performance of such service, both under his contract for the performance of service and in fact; and (II) such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and (III) such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed . . . . " General Statutes § 31-222 (a) (1) (B) (ii); *F.A.S. International, Inc.* v. *Reilly,* supra, 511–12. Under Part A of the ABC test, therefore, in order to denominate them as independent contractors, the plaintiff bore the burden of showing that the PCAs who cared for him have "been and will continue to be free from control and direction in connection with the performance of such service, both under [their] contract for the performance of service and in fact." General Statutes § 31-222 (a) (1) (B) (ii) (I);

*State Department of Labor* v. *Medical Placement Services, Inc.,* supra, 384; *Appeal of Work-A-Day of Nashua, Inc.,* supra, 291.

"The fundamental distinction between an employee and an independent contractor depends upon the existence or nonexistence of the right to control the means and methods of work." *Beaverdale Memorial Park, Inc.* v. *Danaher,* 127 Conn. 175, 179, 15 A.2d 17 (1940); *Northwestern Mutual Life Ins. Co.* v. *Tone,* 125 Conn. 183, 190, 4 A.2d 640 (1939); *Norwalk Gaslight Co.* v. *Norwalk,* 63 Conn. 495, 524, 28 A. 32 (1893); see *Yurs* v. *Director of Labor,* 94 Ill. App. 2d 96, 103, 104, 235 N.E.2d 871 (1968). " 'The test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent.' *Hartley* v. *Red Ball Transit Co.,* 344 Ill. 534, 539, 176 N.E. 751 (1931)." *Caraher* v. *Sears, Roebuck & Co.,* 124 Conn. 409, 413–14, 200 A. 324 (1938). An employer-employee relationship does not depend upon the actual exercise of the right to control. The right to control is sufficient. Id.; *Zimmer-Jackson Associates, Inc.* v. *Department of Labor,* 231 Mont. 357, 361, 752 P.2d 1095 (1988); *Prime Kosher Foods, Inc.* v. *Bureau of Employment Services,* 35 Ohio App. 3d 121, 123, 519 N.E.2d 868 (1987). " 'The decisive test is who *has the right* to direct what shall be done and when and how it shall be done? Who has *the right of general control?' Thompson* v. *Twiss,* 90 Conn. 444, 447, 97 Atl. 328 [1916]." (Emphasis added.) *Caraher* v. *Sears, Roebuck & Co.,* supra, 413; *Northwestern Mutual Life Ins. Co.* v. *Tone,* supra, 191; *Bennett* v. *Department of Employment Security,* 175 Ill. App. 3d 793, 797, 530 N.E.2d 541 (1988).

The hearing officer could reasonably have concluded, on the basis of his unchallenged factual findings, that the right to general control of the activities of the PCAs

rested in the plaintiff and that consequently an employer-employee relationship existed between him and the PCAs. At the least, he could reasonably have determined that the plaintiff had failed to sustain his burden of showing that the PCAs who cared for him were free from his control and direction in the rendering of their services. Consequently, the plaintiff has not satisfied the A test of § 31-222 (a) (1) (B) (ii) and was therefore liable to pay the administrator's assessment of unemployment tax contributions against him.

"The determination of the status of an individual as an independent contractor or employee is often difficult (note, 124 A.L.R. 682) and, in the absence of controlling considerations, is a question of fact. *Francis* v. *Franklin Cafeteria, Inc.,* 123 Conn. 320, 326, 195 Atl. 198 [1937]." *Robert C. Buell & Co.* v. *Danaher,* 127 Conn. 606, 610, 18 A.2d 697 (1941); *F.A.S. International, Inc.* v. *Reilly,* supra, 513. The retention of the right to discharge, which was admittedly reserved by the plaintiff in this case, is a strong indication that his relationship with the PCAs who attended him was one of employment. *Beaverdale Memorial Park, Inc.* v. *Danaher,* supra, 179; *Jack & Jill, Inc.* v. *Tone,* 126 Conn. 114, 119, 9 A.2d 497 (1939). " 'The right to terminate [an employment] relationship without liability is not consistent with the concept of an independent contract.' " *Johnson* v. *Department of Labor & Industry,* 240 Mont. 288, 293, 783 P.2d 1355 (1989), quoting 1C A. Larson, Workmen's Compensation Law § 44.35, pp. 8-149—8-158. Moreover, payment of a worker at an hourly rate, the basis on which the plaintiff paid the PCAs in this instance, is persuasive evidence that the status of the worker is that of an employee rather than that of an independent contractor. *Johnson* v. *Department of Labor & Industry,* supra; *Solheim* v. *Ranch,* 208 Mont. 265, 273, 677

P.2d 1034 (1984); see *Department of Employment* v. *Brown Bros. Construction, Inc.,* 100 Idaho 479, 482, 600 P.2d 783 (1979).

In addition to the right to discharge and the manner of payment, the hearing officer took note of other factors that weigh in favor of a determination that the relationship between the plaintiff and the PCAs was that of employer-employee and that the PCAs were not independent contractors. The hearing officer determined that the PCAs were required to comply with certain general directives as to when their services were required. While the PCAs made known their hours of availability, it was the plaintiff who established the hours when they were to work. Further, the PCAs could be directed to perform personal errands for the plaintiff and were required to be cognizant of instructions concerning his care. Moreover, services to the plaintiff were expected to be rendered personally by the particular PCAs selected by the registry, based on needs and instructions communicated to the registry by the plaintiff's attorney-in-fact. The plaintiff was interested not only in a final result but in who rendered the service. The hearing officer also found that the PCAs did not have any significant investment in the materials or tools necessary to perform their job. Any needed equipment or materials were furnished by the plaintiff. In addition, the hearing officer concluded that the PCAs, unlike independent contractors, were not in a position to realize a profit or suffer a loss based on the service that they provided. Rather, they were paid an agreed hourly wage directly by the plaintiff.

More important than the above enumerated factors is the hearing officer's finding that the PCAs reported their day-to-day activities to Christian, the plaintiff's attorney-in-fact, and that Christian monitored the level of care afforded the plaintiff. That finding embodies

the logical inference that the reporting and monitoring had a purpose and that, if the care given the plaintiff were unsatisfactory, Christian could, and would, intervene and take corrective measures. That right of intervention, which we believe clearly exists under the facts, evinces a right to control and direct the PCAs by the recipient of their services. The reporting of their day-to-day activities to Christian by the PCAs and the monitoring of those activities by Christian, who possessed the right to discharge the PCAs, is hardly indicative of the degree of independence that distinguishes an independent contractor from an employee. That the PCAs were permitted to perform their day-to-day duties without interference so long as those duties were performed in a satisfactory manner does not militate against a conclusion of control. See *Caraher* v. *Sears, Roebuck & Co.,* supra, 413. As previously noted, it is not the actual exercise of the right to control that distinguishes an employer from an independent contractor, but rather the employer's possession of the right to control. Id., 413–14; *Zimmer-Jackson Associates, Inc.* v. *Department of Labor,* supra, 361; *Prime Kosher Foods, Inc.* v. *Bureau of Employment Services,* supra, 123.

The fact that the PCAs placed with the plaintiff by the registry signed an agreement that they were "independent contractors" is of no moment. "Language in a contract that characterizes an individual as an independent contractor [rather than an employee] is not controlling. The primary concern is what is done under the contract and not what it says. *Insul-Lite Window & Door Mfg., Inc.* v. *Industrial Commission,* 723 P.2d 151 (Colo. App. 1986)." *Locke* v. *Longacre,* 772 P.2d 685, 686 (Colo. App. 1989); *State Department of Labor* v. *Medical Placement Services, Inc.,* supra, 384. Such provisions in a contract are not effective to keep an employer outside the purview of the act when the estab-

lished facts bring him within it. "We look beyond the plain language of the contract to the actual status in which the parties are placed." *Ellison, Inc.* v. *Board of Review,* 749 P.2d 1280, 1284 (Utah App.), cert. denied, 765 P.2d 1278 (Utah 1988).

Because the prongs of the ABC test contained in § 31-222 (a) (1) (B) (ii) (I), (II) and (III) are conjunctive, the inability of the recipient of services to satisfy any single one of those prongs necessarily results in a conclusion that an employer-employee relationship exists for the purposes of the Unemployment Compensation Act. Having determined that the plaintiff has failed to satisfy prong A of the ABC test we deem it unnecessary to consider prongs B or C. *State Department of Labor* v. *Medical Placement Services, Inc.,* supra, 385–86; *Gay Hill Field Service* v. *Board of Review,* supra, 609; *Ellison, Inc.* v. *Board of Review,* supra, 1283.

The judgment of the trial court is affirmed although on a different ground from that relied upon in its memorandum of decision. "[T]his court is authorized to rely upon alternative grounds supported by the record to sustain a judgment." *Pepe* v. *New Britain,* 203 Conn. 281, 292, 524 A.2d 629 (1987); *Henderson* v. *Department of Motor Vehicles,* 202 Conn. 453, 461, 521 A.2d 1040 (1987); *W. J. Megin, Inc.* v. *State,* 181 Conn. 47, 54, 434 A.2d 306 (1980).

The judgment is affirmed.

In this opinion the other justices concurred.