BETTY L. TIANTI, COMMISSIONER OF LABOR EX REL.
MARILYN GLUCK ET AL. *v.* WILLIAM
RAVEIS REAL ESTATE, INC.
(14988)

PETERS, C. J., and CALLAHAN, BERDON, KATZ and PALMER, Js.

___

Argued September 27, 1994—decision released January 10, 1995

*Stanton H. Lesser*, with whom was *Stephanie Z. Roberge*, for the appellant (defendant).

*Glenn A. Woods*, assistant attorney general, with whom were *Edward F. Reynolds*, *Gary G. Williams* and *Judith Brown*, assistant attorneys general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellee (plaintiff).

CALLAHAN, J. The plaintiff, the commissioner of the department of labor, brought this action on behalf of two real estate salespersons, Marilyn Gluck and Marilyn Lyren, against the defendant, William Raveis Real Estate, Inc., pursuant to General Statutes § 31-72,[1] to

---

[1] General Statutes § 31-72 provides in relevant part: "When any employer fails to pay an employee wages in accordance with the provisions of sec-

collect unpaid remuneration allegedly owed to Gluck and Lyren by the defendant. Although the claimants' cases were tried together, each has a unique factual situation that will be discussed individually.

Gluck was a real estate salesperson for the defendant from January, 1982, until March, 1988. Gluck claimed that in 1987, William Raveis, the defendant's president, promised a full commission to the salesperson who first introduced him to new office space suitable for the company to purchase or lease in New Haven. The claimant alleged that she was the first person to introduce Raveis, through her office manager Carole Anne Pepe, to a property at 199 Whitney Avenue in New Haven, which eventually was leased by the defendant for business purposes.

Two other salespersons in the same office also claimed that they were entitled to receive a commission from the defendant because of the defendant's lease of the property. On June 21, 1988, after Gluck had left the company, the defendant's regional vice-president, Chris Cooke, informed Gluck by letter that she would be paid only $2400 of the $12,000 commission received by Raveis, $6000 of which had been expended for legal fees necessitated by problems connected with the lease of the property. Of the $6000 remaining, Cooke determined that Gluck was entitled to 40 percent, while the other two salespersons who claimed the commission were each entitled to receive 30 percent of the commission. Pursuant to § 31-72, the plaintiff brought this action on Gluck's behalf to collect the full amount of the unpaid commission allegedly due Gluck.

tions 31-71a to 31-71i . . . [t]he labor commissioner may collect the full amount of any such unpaid wages . . . . In addition, the labor commissioner may bring any legal action necessary to recover twice the full amount of unpaid wages . . . and the employer shall be required to pay the costs and such reasonable attorney's fees as may be allowed by the court. . . ."

From 1986 to 1988, Lyren was the sales manager for the defendant's Greenwich office and later for the defendant's Trumbull office. For the first year Lyren was paid $2000 per month plus a 5 percent override[2] on every commission generated by the office. Thereafter she was paid a straight 8 percent override on commissions. Lyren alleged that she was owed overrides on transactions on which binders[3] had been executed before she had left the company. After she resigned, Lyren received no compensation from the defendant despite her repeated requests for payment of the overrides on those real estate transactions. The plaintiff brought this action on behalf of Lyren pursuant to § 31-72.

The claims of both Gluck and Lyren were tried together.[4] The trial court found that both claimants were employees for purposes of § 31-72 as that term is defined in General Statutes § 31-71a.[5] The court thereafter determined that the plaintiff was entitled to recover the sum of $24,068.29; $12,000 of that sum was owed to Gluck and $12,068.29 was owed to Lyren.

[2] An override is the manager's commission, which is taken out of the company's commission.

[3] "Binder" as used in this case means that the property to be sold is under a legally binding contract between the buyer and seller. According to Lyren's testimony, "In our industry, a binder is—when you have an accepted offer brought into the company, it is a form we use to complete the information for the transaction, that then is fed into a computer. And from that, then, when the transaction closes, the agent, the company, the regional and the office managers are all paid." The transaction on which a binder has been executed is "[w]hen they were ready to—you know, a completed deal, ready, waiting, just, for a closing."

[4] Originally, there was a third claim brought by Anthony Shays. His claim was settled prior to trial.

[5] General Statutes § 31-71a provides: "PAYMENT OF WAGES: DEFINITIONS. Whenever used in sections 31-71a to 31-71i, inclusive:

"(1) 'Employer' includes any individual, partnership, association, joint stock company, trust, corporation, the administrator or executor of the estate of a deceased person, the conservator of the estate of an incompe-

The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). The only issues before us are whether the trial court was correct in finding that: (1) the claimants, as employees rather than independent contractors, fell within the purview of §§ 31-72 and 31-71a; and (2) Lyren had met her burden of proof with regard to damages. We conclude that the trial court correctly determined both issues and affirm the trial court's judgment.

I

The plaintiff successfully argued to the trial court that the claimants were employees of the defendant company and that consequently she was authorized to bring a civil action pursuant to § 31-72 to collect unpaid wages owed to them. The defendant argued in the trial court and in this court that the claimants were not employees, but rather were independent contractors, and therefore were not within the purview of § 31-72. We agree with the plaintiff.

The defendant's first argument is that the claimants' status as independent contractors was definitively established by Gluck's admission to that effect during her trial testimony. "Whether a party's statement is a judicial admission or an evidentiary admission is a

___

tent, or the receiver, trustee, successor or assignee of any of the same, employing any person, including the state and any political subdivision thereof;

"(2) 'Employee' includes any person suffered or permitted to work by an employer;

"(3) 'Wages' means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation;

"(4) 'Commissioner' means the labor commissioner."

factual question for the trial court."[6] C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 6.5, p. 132, citing *Sweet* v. *Sweet*, 190 Conn. 657, 662, 462 A.2d 1031 (1983) ("[w]hether these statements when viewed as a whole result in a judicial admission is a determination best left to the trial court which observed the witnesses, heard the testimony and was the sole judge of the weight to be accorded such testimony"). The trial court, in holding that the claimants were employees of the defendant and not independent contractors, necessarily concluded that Gluck's statement was not a judicial admission.[7] If Gluck's statement was merely an evidentiary admission, her view of her relationship to the defendant is not dispositive. For instance, in *Latimer* v. *Administrator*, 216 Conn. 237, 251, 579 A.2d 497 (1990), we found an employer-employee relationship even in the face of a signed agreement stating that the parties were independent contractors. In determining whether an employment relationship exists, " '[w]e look beyond the plain language of the contract to the actual status in which the parties are placed.' " Id., 252.

The defendant's next argument is that the claimants in this case could not be considered employees in light of the language of the governing statutes. Section 31-72 allows the labor commissioner to collect the full amount

[6] "The distinction between judicial admissions and mere evidentiary admissions is a significant one that should not be blurred by imprecise usage. . . . While both types are admissible, their legal effect is markedly different; judicial admissions are conclusive on the trier of fact, whereas evidentiary admissions are only evidence to be accepted or rejected by the trier." C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 6.5, p. 132.

[7] "A judicial admission dispenses with the production of evidence by the opposing party as to the fact admitted, and is conclusive upon the party making it." (Internal quotation marks omitted.) *Pedersen* v. *Vahidy*, 209 Conn. 510, 519-20, 522 A.2d 419 (1989). In this case, Gluck's characterization of herself as an independent contractor is better defined as a legal conclusion made by a lay witness that cannot, and was not, construed as a judicial admission of a fact.

of any unpaid wages that an employer has failed to pay an employee. The terms employer, employee and wages are defined in § 31-71a. An employer "includes any individual, partnership, association, joint stock company, trust, corporation, the administrator or executor of the estate of a deceased person, the conservator of the estate of an incompetent, or the receiver, trustee, successor or assignee of any of the same, employing any person . . . ." General Statutes § 31-71a (1). An employee "includes any person suffered or permitted to work by an employer." General Statutes § 31-71a (2). The term wages is defined to include "commission." General Statutes § 31-71a (3). The purpose of § 31-72 is remedial, and therefore it must be given a liberal construction in favor of those whom the legislature intended to benefit. *Chrysler Corp.* v. *Maiocco*, 209 Conn. 579, 595, 552 A.2d 1207 (1989). From a reading of the plain language of these statutory provisions, it would appear that a real estate salesperson, engaged by a real estate brokerage firm doing business as a corporation and compensated by commission, would be someone who was "suffered or permitted to work by an employer," and hence an employee. General Statutes § 31-71a (2).

Application of our prior case law confirms that the trial court properly concluded that these particular claimants were employees, within the purview of § 31-72, rather than independent contractors. "The determination of the status of an individual as an independent contractor or employee is often difficult . . . and, in the absence of controlling considerations, is a question of fact." (Citation omitted; internal quotation marks omitted.) *Latimer* v. *Administrator*, supra, 216 Conn. 249. It has long been established that "[t]he fundamental distinction between an employee and an independent contractor depends upon the existence or nonexistence of the right to control the means and

methods of work." (Internal quotation marks omitted.) Id., 248; *Silverberg* v. *Great Southwest Fire Ins. Co.*, 214 Conn. 632, 639, 573 A.2d 724 (1990); *Panaro* v. *Electrolux Corp.*, 208 Conn. 589, 603, 545 A.2d 1086 (1988); *F.A.S. International, Inc.* v. *Reilly*, 179 Conn. 507, 512, 427 A.2d 392 (1980); *Beaverdale Memorial Park, Inc.* v. *Danaher*, 127 Conn. 175, 179, 15 A.2d 17 (1940); *Aisenberg* v. *C. F. Adams Co.*, 95 Conn. 419, 421, 111 A. 591 (1920). "The test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent." (Internal quotation marks omitted.) *Latimer* v. *Administrator,* supra, 248; *Caraher* v. *Sears, Roebuck & Co.*, 124 Conn. 409, 413–14, 200 A. 324 (1938). An independent contractor has been defined as "one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer, except as to the result of his work." (Internal quotation marks omitted.) *Silverberg* v. *Great Southwest Fire Ins. Co.*, supra, 639; *Alexander* v. *R. A. Sherman's Sons Co.*, 86 Conn. 292, 297, 85 A. 514 (1912).

The so-called "ABC test" which is used to determine the existence of an employment relationship for the purpose of unemployment compensation; see General Statutes § 31-222 (a) (1) (B) (ii); *F.A.S International, Inc.* v. *Reilly,* supra, 179 Conn. 512;[8] is also applicable here.

---

[8] "Under the ABC test any service provided by an individual is considered employment, unless and until the recipient of the services provided has sustained the burden of showing to the satisfaction of the administrator that (I) such individual has been and will continue to be free from control and direction in connection with the performance of such service, both under his contract for the performance of service and in fact; and (II) such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and (III) such

The paramount factor in that three part test to determine whether a person is an employee is the first, which is the right to control not only the results of work but also the methods of work. This control test is by nature a balancing test. " 'The determination of general control is not always a simple problem. Many factors are ordinarily present for consideration, no one of which is, by itself, necessarily conclusive.' " *Silverberg* v. *Great Southwest Fire Ins. Co.*, supra, 214 Conn. 639; *Bourgeois* v. *Cacciapuoti*, 138 Conn. 317, 321, 84 A.2d 122 (1951).

In the present case, the trial court found that the defendant retained the right to control, and actually exerted a great deal of control over, the real estate salespersons and sales managers affiliated with it. Both salespersons and managers were required to attend mandatory office meetings; both did business under the defendant's name; both used the company letterhead, business cards and supplies; both were required to attend training sessions; and both were threatened with discharge if they did not comply with these requirements. "The right to terminate [an employment] relationship without liability is not consistent with the concept of an independent contract." (Internal quotation marks omitted.) *Latimer* v. *Administrator*, supra, 216 Conn. 249. Additionally, the managers were required to read The Book of Five Rings and to discuss a book report about its themes, "discussing how we were then to treat our competitors like the Samurai warriors." Gluck was required to put in specified hours of floor time and Lyren was required to work forty hours per week plus put in an office appearance on weekends.

individual is customarily engaged in an independently established trade occupation, profession or business of the same nature as that involved in the service performed . . . ." (Internal quotation marks omitted.) *Latimer* v. *Administrator*, supra, 216 Conn. 247; *F.A.S. International, Inc.* v. *Reilly*, supra, 179 Conn. 511–12. This test is codified in § 31-222 (a) (1) (B) (ii) for the purpose of defining employment for unemployment compensation benefits.

The defendant claims that both claimants were independent contractors because they received 1099 forms rather than W-2 forms for income tax purposes, and that they did not receive medical benefits. While these factors weigh in the defendant's favor, they are insufficient to persuade us that the claimants were not employees for the narrow purposes of § 31-72. The defendant also claims that its real estate salespersons are not employees because they explicitly are not covered under the Unemployment Compensation Act, pursuant to General Statutes § 31-222 (a) (5) (K),[9] or the Workers' Compensation Act, pursuant to General Statutes § 20-312b.[10] As the plaintiff aptly notes, however, the legislature did not exempt real estate salespersons from § 31-72, and in fact defined "employee" quite broadly in § 31-71a (2). If the legislature had intended to exempt real estate salespersons from the operation of § 31-72, it obviously was capable of doing so, as is evidenced by their exemption from the Unemployment and Workers' Compensation Acts. Its failure to do so is an indication of a contrary intention. See *In re Ralph M.*, 211 Conn. 289, 306, 559 A.2d 179 (1989) ("we apply the tenet of statutory construction that [w]here a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is signifi-

---

[9] General Statutes § 31-222 (a) (5) provides in relevant part: "No provision of this chapter . . . shall apply to any of the following types of service or employment, except when voluntarily assumed . . .

"(K) Service performed . . . by an individual as a real estate salesman, if all such service is performed for remuneration solely by way of commission . . . ."

[10] General Statutes § 20-312b provides in relevant part: "A licensed real estate broker or real estate salesman . . . shall not be considered an employee under the provisions of section 31–275 [the definitional section of the Workers' Compensation Act] if substantially all of the remuneration for the services performed by such . . . salesman . . . is directly related to sales or other output rather than to the number of hours worked . . . ."

cant to show that a different intention existed" [internal quotation marks omitted]).

The factors delineated above indicate that the right of the defendant to control its employees far outweighs the factors that indicate an independent contractor relationship. See *Silverberg* v. *Great Southwest Fire Ins. Co.*, supra, 214 Conn. 639. Because the ABC test is conjunctive, and because we conclude that the defendant in the present case had the right to control the claimants, we need not address the second and third parts of the test. See footnote 8. We conclude that, in the particular circumstances presented, the trial court's determination that Gluck and Lyren were employees of the defendant, bringing them within the purview of § 31-72, is legally and logically correct and finds support in the facts that reasonably could have been found by the trial court. *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221, 435 A.2d 24 (1980).

II

The defendant next claims that the plaintiff failed to prove that the real estate transactions for which binders had been executed[11] while Lyren was in the defendant's employ actually had closed so as to enable the defendant to receive its commission. Because it was conceded that Lyren was not eligible to receive her overrides until the defendant received its commissions, the defendant maintains that the plaintiff had not met her burden of proof with regard to damages in Lyren's case. We disagree.

It is axiomatic that the trier of fact may draw reasonable and logical inferences from the facts proven. *State* v. *Ford*, 230 Conn. 686, 692, 646 A.2d 147 (1994). In doing so, finders of fact "are not expected to lay aside matters of common knowledge or their own obser-

---

[11] See footnote 3.

vation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) Id., 693. Our review of the fact finder's inferences is limited to determining whether the inferences drawn are " 'so unreasonable as to be unjustifiable.' " Id., 692, citing *State* v. *Hayes*, 127 Conn. 543, 555, 18 A.2d 895 (1941).

In the present case, the plaintiff had the burden to prove, by a preponderance of the evidence, that the defendant owed Lyren the overrides on transactions that had been bindered before Lyren had left the defendant's employ, but that had closed after she had left. The plaintiff produced evidence that binders for thirty-seven properties were outstanding at the time Lyren left the defendant's employ.[12] The trial court

---

[12] It is true that the plaintiff could have, and perhaps should have, searched the land records with regard to the thirty-seven different properties involved in this case. The plaintiff, however, attempted to ascertain this information through discovery. The plaintiff made discovery requests several times by way of subpoenas duces tecum. Despite a court order to comply with the plaintiff's production requests, the defendant did not produce the documents that were requested. The plaintiff also attempted to depose William Raveis, the president of the company, but that deposition was abruptly terminated by Raveis' attorney. William Eagan, an investigator with the department of labor, testified that the defendant did not return his calls. He also testified that he sent a letter to the defendant "requesting either payment or information as to why the monies were not due, and that was again ignored." Eagan went on to say that "[t]here was no cooperation whatsoever at any time." It is apparent that the defendant refused to cooperate in discovery, which is directly contrary to the open discovery doctrines in Connecticut. See Practice Book § 218; *Lougee* v. *Grinnell*, 216 Conn. 483, 489, 582 A.2d 456 (1990) ("Practice Book § 218 . . . liberally permits discovery of information 'material to the *subject matter* involved in the pending action' " [emphasis added]); *Sanderson* v. *Steve Snyder Enterprises, Inc.*, 196 Conn. 134, 140, 491 A.2d 389 (1985) (this jurisdiction has liberal discovery doctrines). Further, defense counsel conceded at oral argument before this court that such documents existed and that he had had them with him during the trial but that he never turned them over because the plaintiff's attorney neglected to request specifically that they be handed

found that "[t]hese binders were all based on contracts to purchase real estate as to which deposits had been lodged with the defendant and, although it is possible that a purchaser would renege on one, it is unlikely and such a remote possibility may reasonably be eliminated in estimating the amount of the commissions received by the defendant." The evidence did not reflect, and the defendant does not point to anything in the record to indicate, that there were contingencies in these underlying contracts. The binder sheets produced by the plaintiff listed, for each property, only a contract date and a closing date.

It was the plaintiff's burden to prove, by a preponderance of the evidence, that Lyren was owed her overrides. In order to satisfy the burden of proof by a preponderance of the evidence, all the plaintiff need to have shown was that it was more likely than not that the defendant received its commissions on the transactions on which binders had been executed before Lyren had left the defendant's employ. See C. Tait & J. LaPlante, supra, § 4.4.1, p. 73 ("[t]he burden of persuasion can be satisfied by circumstantial evidence if the trier finds that the facts from which the trier is asked to draw the inference are proven and that the inference is not only logical and reasonable, but strong enough so that it can be found to be more probable than not"). The trial court, sitting as a finder of fact, was free to apply its common knowledge and experience to infer from the facts proven that it was more likely than not that the transactions on which binders had been executed resulted in closings from which the defendant received its commissions. Under the limited circumstances of this case, we find that the trial court's

over at trial. It would not be wise precedent to hold that by stonewalling, a defendant could ensure the defeat of its opponent's claim, especially where the defendant had superior information regarding that claim.

inference was not "so unreasonable as to be unjustifiable." Lyren, therefore, was entitled to her overrides.

The judgment is affirmed.

In this opinion PETERS, C. J., and KATZ and PALMER, Js., concurred.

BERDON, J., concurring and dissenting. I concur in the result, on the basis of a statutory analysis that, for the purposes of General Statutes § 31-72, Marilyn Gluck and Marilyn Lyren were employees. I would not, however, travel the route of the so called "ABC test" referred to by the majority.

In order to determine whether Gluck and Lyren come within the provisions of § 31-72 we must look to the specific statutory definition of employee. See *Weinberg* v. *ARA Vending Co.*, 223 Conn. 336, 349, 612 A.2d 1203 (1992) (where legislature has specifically defined an operative term used within a statute, the court is bound to accept that definition). For purposes of § 31-72, an "employee" broadly "includes any person suffered or permitted to work by an employer." General Statutes § 31-71a (2). The plain language of § 31-71a encompasses *any* person who performs work for an employer. Wages, for the purposes of § 31-72, include "compensation for . . . services rendered by an employee, whether the amount is determined on a time, task, piece, *commission* or other basis of calculation . . . ." (Emphasis added.) General Statutes § 31-71a (3). Therefore, according to the expansive plain language of § 31-71a, and for the purposes of § 31-72, the relationship between the defendant and Gluck and Lyren was one of "employer" and "employee."

Furthermore, if the legislature had intended a more restrictive definition for employees who are entitled to the remedy pursuant to § 31-72, it would have provided for it as it did in other statutes governing labor.

See, e.g., General Statutes § 31-58 (f) (restrictive definition of "employee" for purposes of minimum wages); General Statutes § 31-222 (a) (5) (K) (for purposes of unemployment compensation, real estate salespersons are specifically excluded); General Statutes § 20-312b (for purposes of workers' compensation, real estate salespersons are specifically excluded). "[S]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law." (Internal quotation marks omitted.) *In re Valerie D.*, 223 Conn. 492, 524, 613 A.2d 748 (1992).

Moreover, given the remedial purposes of the statute, § 31-72 must be given a liberal construction in favor of those whom the legislature intended to benefit. See *Chrysler Corp.* v. *Maiocco*, 209 Conn. 579, 595, 552 A.2d 1207 (1989). It is obvious that the legislature intended to provide an effective remedy for persons who have not been paid their wages or other compensation including commissions. Accordingly, I agree that Gluck and Lyren were employees under the broad definition of § 31-71a (2) for purposes of collecting their compensation pursuant to § 31-72.

I disagree, however, with the majority in regard to the damages awarded to Lyren. There was undisputed evidence that Lyren was not entitled to her override commissions of 8 percent unless each real estate transaction that was subject to a "binder" resulted in a "closing"—that is, a consummated real estate transaction where title was transferred to the purchaser and the defendant received its commission. There was no evidence presented at trial that these binders for which Lyren claimed overrides ever closed. The trial court recognized this, but drew an inference that they did close on the grounds that: (1) it was "reasonable to assume that in 1988 at the height of the real estate boom these [transactions closed]"; and (2) each

"binder" was accompanied with a deposit from the purchaser and "although it is possible that a purchaser would renege on one, it is [an] unlikely and . . . remote possibility . . . ."

These binders, that evince the formation of contracts, are usually conditioned on many contingencies including mortgage approval, physical inspection, and the outcome of the title search. The failure of any one of these conditions could prevent a closing and result in the return of a buyer's deposit. Therefore, Lyren's proof that several properties were subject to binders at the time Lyren left the defendant's employment cannot be used to infer that those properties actually closed and that Lyren is entitled to her overrides. The trial court's inference to the contrary was not reasonable. Inferences are capable of bridging many gaps. But the span of this gap is too wide logically to support such an inference. (Paraphrasing Rutledge, J., in *Galloway* v. *United States*, 319 U.S. 372, 386, 63 S. Ct. 1077, 87 L. Ed. 1458, reh. denied, 320 U.S. 214, 63 S. Ct. 1443, 87 L. Ed. 1851 [1943]). In order to establish a prima facie case and sustain its burden of production, the plaintiff must present sufficient evidence "to remove the issue from speculation or conjecture . . . ." C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 4.3, p. 72; *Terminal Taxi Co.* v. *Flynn*, 156 Conn. 313, 316, 240 A.2d 881 (1968). Lyren did not present sufficient evidence to establish a prima facie case on damages.

Indeed, in this case, the plaintiff implicitly recognized that the evidence upon which she relied was insufficient to infer that the binders resulted in closings because she sought to bolster Lyren's case by relying on a negative inference. The plaintiff attempted to invoke the negative inference that the properties subject to binders closed because the defendant failed to produce evidence that any of the subject properties did not close, and such information would have been within the defendant's

power to produce had this occurred. The majority appropriately refused to employ a negative inference to determine whether the plaintiff had established a prima facie case.[1] The fact remains that the plaintiff has produced insufficient evidence to establish that the

[1] Negative inferences cannot be invoked to establish a prima facie case and can be used only by the trier in weighing the evidence and determining the ultimate burden of persuasion. *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 676, 165 A.2d 598 (1960); *Doty* v. *Wheeler*, 120 Conn. 672, 679, 182 A. 468 (1936).

The *Secondino* adverse inference has come under criticism by legal scholars. Professor Colin C. Tait writes: "The continuing validity of the 'missing witness' rule should be called into question. Not only does it consume an undue proportion of the attention of both appellate courts, its underlying premise has been substantially undermined. The rule originated at a time when parties 'vouched' for the veracity of their witnesses so that an opponent dared not call an adverse witness. Since a partial witness would be called only by the favored party, that party's failure to call the witness, if available, warranted a negative inference. The voucher rule no longer applies in Connecticut. Under Connecticut's modern rules a party may call an adverse witness, including the opposing party. If an adverse witness is called, the party calling that witness may use leading questions to interrogate the witness and, if necessary, to impeach the witness. In addition, Connecticut permits widespread discovery so that all parties know, and may depose, all relevant witnesses before trial. Thus, each party should in fact know which witnesses are favorable to which side. That being so, why should a party not be required to call any witness favorable to his cause? If a witness is available, he is equally available to both sides. If a witness has information favorable to one side, why shouldn't that side call that witness and bring out that information instead of relying on a negative inference based on ignorance that such a witness might have some unspecified information that might be unfavorable to the other party? See *Herbert* v. *Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1046–1048 (5th Cir. 1990). Moreover, the *Secondino* rule is costly. It consumes the time of both the court and the parties, and it incurs expense even for parties who do not wish to call a witness, since they must nevertheless pay to have witnesses available to preclude the assertion of an adverse inference." C. Tait & J. LaPlante, Connecticut Evidence (Sup. 1994) § 11.5.4, pp. 50–51. Indeed, its misuse in Connecticut is apparent and could have life and death consequences. *State* v. *Ross*, 230 Conn. 183, 324–34, 646 A.2d 1318 (1994) (*Berdon, J.*, dissenting) (majority suggested that state is entitled to *Secondino* adverse inference jury instruction for failure to call psychiatric witness whom defense consulted in capital murder trial notwithstanding attorney-client privilege).

properties closed and therefore has not shown that Lyren is entitled to receive overrides on those properties.

Accordingly, I would find that in Lyren's case, the trial court was not correct in drawing the inference that the binders resulted in closings. I would reverse and remand the Lyren case to the trial court for a new trial on damages. I would affirm the judgment of the trial court in regard to the case of Gluck.