******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STANDARD OIL OF CONNECTICUT, INC. *v.* ADMINISTRATOR, UNEMPLOYMENT COMPENSATION ACT
### (SC 19493)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued October 15, 2015—officially released March 15, 2016*

*Procedural History*

Appeal from the decision of the Employment Security Appeals Division, Board of Review, upholding the decision of an appeals referee, which affirmed the determination of the defendant that certain persons who had performed services for the plaintiff were the plaintiff's employees, brought to the Superior Court in the judicial district of Fairfield and tried to the court, *Hon. Richard P. Gilardi*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment dismissing the plaintiff's appeal, from which the plaintiff appealed. *Reversed*; *judgment directed.*

*Glenn A. Duhl*, with whom was *Angelica M. Wilson*, for the appellant (plaintiff).

*Thomas P. Clifford III*, assistant attorney general, with whom were *Krista Dotson O'Brien*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, and *Phillip M. Schulz*, assistant attorney general, for the appellee (defendant).

*Michael C. Harrington* and *Jennifer A. Corvo* filed a brief for the Connecticut Business and Industry Association, Inc., as amicus curiae.

*Opinion*

ZARELLA, J. The plaintiff, Standard Oil of Connecticut, Inc., appeals from the judgment of the trial court dismissing its appeal from the decision of the Employment Security Appeals Division, Board of Review (board). The board denied in part the plaintiff's motion to correct findings of fact made by the appeals referee and concluded that the workers at issue are the plaintiff's employees under the test set forth in the Connecticut Unemployment Compensation Act (act), General Statutes § 31-222 et seq. On appeal, the plaintiff claims that the trial court applied the wrong legal standard in reviewing its motion to correct. The plaintiff also claims that the trial court improperly concluded that the workers were the plaintiff's employees under § 31-222 (a) (1) (B) (ii) because they were subject to the plaintiff's control and direction in the performance of their services and they performed their services at the plaintiff's places of business. The defendant, the Unemployment Compensation Act Administrator, responds that the trial court applied the proper legal standard in reviewing the plaintiff's motion to correct and properly concluded that the workers were the plaintiff's employees under the test set forth in the act. We reverse the judgment of the trial court.

The following relevant facts and procedural history are set forth in the trial court's memorandum of decision. "The plaintiff . . . [is in the business of selling and delivering home heating oil and also] provides home heating and alarm systems to residential customers. In doing so, it utilizes the services of certain individuals who [clean, service and install] heating/air conditioning systems or who [install] security systems (installers/technicians). In June of 2008, the . . . Department of Labor conducted an audit of the plaintiff. Following the audit, the [defendant] determined that the installers/technicians were misclassified as independent contractors rather than as employees. The [defendant] further concluded that, due to this misclassification, the plaintiff owed $41,501.38 in unemployment contribution taxes, plus interest, for 2007 and 2008.

"The plaintiff appealed [from] the [defendant's] decision to the [appeals referee], who conducted an evidentiary hearing. Following this hearing, the appeals referee issued a decision with findings of fact, affirming the [defendant's] decision. The plaintiff then appealed to the [board]. The board modified the appeals referee's findings of fact and made additional findings in a decision on March 21, 2012. It determined that the plaintiff had met part C (General Statutes § 31-222 [a] [1] [B] [ii] [III]) of the test set out in . . . § 31-222 (a) (1) (B) (ii) (the ABC test) for determining whether the installers/technicians were independent contractors, but also determined that the plaintiff had failed to demonstrate that the installers/technicians were indepen-

dent contractors under part A (General Statutes § 31-222 [a] [1] [B] [ii] [I]) and part B (General Statutes § 31-222 [a] [1] [B] [ii] [II]). The plaintiff . . . appeal[ed] [to the trial court] on April 19, 2012, was granted an extension of time to file a motion to correct findings on May 18, 2012, and filed a motion to correct findings on August 30, 2012. The board issued a decision on the motion to correct findings on March 4, 2013, granting the motion in part and denying it in part. The board maintained its earlier decision as to the plaintiff's failure to meet parts A and B."

The plaintiff filed claims of error and an appeal with the trial court. Following oral argument, the court dismissed the appeal on March 24, 2014. The court rejected the plaintiff's claim seeking to correct the board's factual findings and upheld the board's determination that the plaintiff had failed to satisfy parts A and B of the ABC test. This appeal followed.

Section 31-222 (a) (1) (B) (ii) defines "employment" in relevant part as any service performed by "any individual who, under either common law rules applicable in determining the employer-employee relationship or under the provisions of this subsection, has the status of an employee. Service performed by an individual shall be deemed to be employment subject to this chapter irrespective of whether the common law relationship of master and servant exists, unless and until it is shown to the satisfaction of the administrator that (I) such individual has been and will continue to be free from control and direction in connection with the performance of such service, both under his contract for the performance of service and in fact; and (II) such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and (III) such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed . . . ." Because the provision is in the conjunctive, the party claiming the exception to the rule that the service is employment must show that all three prongs of the test have been satisfied. E.g., *JSF Promotions, Inc.* v. *Administrator, Unemployment Compensation Act*, 265 Conn. 413, 419, 828 A.2d 609 (2003).

"[W]hen interpreting provisions of the act, we take as our starting point the fact that the act is remedial and, consequently, should be liberally construed in favor of its beneficiaries. . . . Indeed, the legislature underscored its intent by expressly mandating that the act shall be construed, interpreted and administered in such manner as to presume coverage, eligibility and nondisqualification in doubtful cases. General Statutes § 31-274 (c)." (Internal quotation marks omitted.) *Tuxis Ohr's Fuel, Inc.* v. *Administrator, Unemployment*

*Compensation Act*, 309 Conn. 412, 423, 72 A.3d 13 (2013). We also note that "exemptions to statutes are to be strictly construed." *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, 42 Conn. Supp. 376, 389, 622 A.2d 622 (1992), aff'd, 225 Conn. 99, 622 A.2d 518 (1993). Nevertheless, the act "should not be construed unrealistically in order to distort its purpose." *F.A.S. International, Inc.* v. *Reilly*, 179 Conn. 507, 516, 427 A.2d 392 (1980). "While it may be difficult for a situation to exist where an employer sustains his burden of proof under the ABC test . . . it is important to consider that [t]he exemption [under the act] becomes meaningless if it does not exempt anything from the statutory provisions . . . where the law and the facts merit the exemption in a given case." (Citation omitted; internal quotation marks omitted.) *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, supra, 389–90. Rather, "statutes are to be construed so that they carry out the intent of the legislature. . . . We must construe the act as we find it . . . ." (Citations omitted; internal quotation marks omitted.) *Johnson* v. *Manson*, 196 Conn. 309, 314–15, 493 A.2d 846 (1985), cert. denied, 474 U.S. 1063, 106 S. Ct. 813, 88 L. Ed. 2d 787 (1986).

Having conducted a comprehensive review of the board's modified findings of fact, we conclude that the trial court improperly determined that the installers/technicians were the plaintiff's employees under the first two prongs of the ABC test.[1]

I

We begin with the plaintiff's claim that the installers/technicians were free from its control and direction under part A of the ABC test. The plaintiff contends that the uncontroverted evidence establishes that the installers/technicians retained control and direction over the method and means of their work. The defendant responds that the installers/technicians performed their work subject to the plaintiff's control and direction. We agree with the plaintiff.

The following additional facts are relevant to our resolution of this claim. Although the board modified its findings of fact[2] following a review of the plaintiff's motion to correct, it did not alter its earlier conclusion that the plaintiff had failed to satisfy part A of the ABC test. Thereafter, in upholding the board's conclusion, the trial court noted the board's findings that "the plaintiff advertises installed heating, cooling, and security systems; it makes appointments with customers, then finds an installer or technician who can take the assignment; it does not permit installers or technicians to subcontract; it encourages them to wear apparel bearing the plaintiff's name; it can send an installer or technician back to correct a deficient installation; it pays the installers or technicians a set rate per piece; and it requires them to submit payment invoices no later than the Friday after they complete the work. The board

stated that five installers/technicians [indicated] that the plaintiff has the right to direct how they perform their work in a questionnaire. The board did not credit later statements by two of the installers/technicians that the plaintiff did not have [that] right. The board also stated that the installers can only install equipment provided by the plaintiff and that the technicians use nozzles, filters, and strainers which are provided by the plaintiff for cleaning oil burners. In addition, the board also initially listed the right to terminate without liability as a strong indication of an employer-employee relationship, but, in its decision on the plaintiff's motion to correct findings, removed this as a factor, amending finding [nineteen] to say that the parties stipulated that right to fire would not be a factor."

The court further observed, however, that the board had acknowledged certain factors indicating that "the plaintiff did not exercise control and direction. These included that the installers/technicians signed independent contractor agreements stating they would exercise independence; that they were free to accept or reject assignments, [could] determine the days on which they [would] work, [were] not supervised while performing their work; that the plaintiff [did] not check on their work; that they [were] licensed and certified, that the plaintiff [did] not provide them with an employee handbook and [did] not pay them for training or require training; that the installers/technicians [could] hire employees to assist them and [were] free to supervise their employees; that the installers/technicians [could] realize a profit or a loss; and that they provide[d] their own tools, transportation, and insurance." The court nonetheless concluded that, although the plaintiff had made a "compelling case" that it lacked control and direction, the court was "not convinced that the board lack[ed] substantial evidence for its decision."

We begin by setting forth the standard of review. It is well established that "[r]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts." (Citation omitted; internal quotation marks omitted.) *JSF Promotions, Inc.* v. *Administrator, Unemployment Compensation Act*, supra, 265 Conn. 417–18.

With respect to the governing legal principles, we have stated that "[t]he fundamental distinction between an employee and an independent contractor depends upon the existence or nonexistence of the right to control the means and methods of work. . . . The test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent. . . . An employer-employee relationship does not depend upon the actual exercise of the right to control. The right to control is sufficient. . . . The decisive test is who has the right to direct what shall be done and when and how it shall be done? Who has the right of general control?" (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Latimer* v. *Administrator, Unemployment Compensation Act*, 216 Conn. 237, 248, 579 A.2d 497 (1990). Under this test, we have stated that "[a]n independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his or her employer, except as to the result of his work." (Internal quotation marks omitted.) *Darling* v. *Burrone Bros., Inc.*, 162 Conn. 187, 195, 292 A.2d 912 (1972); accord *Alexander* v. *R. A. Sherman's Sons Co.*, 86 Conn. 292, 297, 85 A. 514 (1912). The plaintiff bears the burden of showing that the workers hired as independent contractors "[have] been and will continue to be free from control and direction in connection with the performance of . . . service[s], both under [their] contract for the performance of service[s] and in fact . . . ." (Internal quotation marks omitted.) *JSF Promotions, Inc.* v. *Administrator, Unemployment Compensation Act*, supra, 265 Conn. 418.

Part A of the ABC test provides that "[s]ervice performed by an individual shall be deemed to be employment . . . unless and until it is shown to the satisfaction of the administrator that . . . such individual has been and will continue to be free from control and direction in connection with the performance of such service, both under his contract for the performance of service and in fact . . . ." General Statutes § 31-222 (a) (1) (B) (ii) (I). Although the meaning of this language may seem clear, past agency interpretations of part A have been highly fact specific and not uniformly upheld on appeal to the Superior Court. See *JSF Promotions, Inc.* v. *Administrator, Unemployment Compensation Act*, Superior Court, judicial district of Hartford, Docket No. CV-97-0575801 (April 2, 2002) (reversing board's decision that product demonstrators hired to work at supermarkets were under plaintiff's control and direction), rev'd, 265 Conn. 413, 828 A.2d 609 (2003); *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, supra, 42 Conn. Supp. 384–85, 412 (reversing board's decision that nurses hired to work at health-care facili-

ties and hospitals on as needed basis were under plaintiff's control and direction). Accordingly, we seek guidance from several appellate decisions in which this court and the Superior Court[3] discussed the conditions necessary to satisfy part A of the ABC test.

We initially addressed the issue of control and direction in *F.A.S. International, Inc.* v. *Reilly*, supra, 179 Conn. 507. In that case, we concluded that the trial court properly had sustained the plaintiff's appeal from the administrator's determination that the professional artists, writers and photographers employed in the plaintiff's correspondence schools to analyze and critique students' lessons were employees of the plaintiff rather than independent contractors. See id., 513, 516. We explained that the professionals "employed different techniques or approaches in their criticism and analysis of student work. The plaintiff's only concern was with the result or end product of their efforts. [The plaintiff] exercised no control over the means and method of their performance. Although it is true, as claimed by the administrator, that [the plaintiff] would not permit its professionals to hire others to evaluate student work which had been given to them for review, this prohibition is not significant because contracts for personal services cannot be assigned without consent. . . . It is obvious that [the plaintiff] depended upon the skill and reputation of the artists, writers and photographers it selected to produce a product of quality. The [plaintiff] did not rely on rote correction of objective examinations."[4] (Citation omitted.) Id., 513.

We next considered the issue of control and direction in *Latimer*. See *Latimer* v. *Administrator, Unemployment Compensation Act*, supra, 216 Conn. 247–49. Unlike in *F.A.S. International, Inc.*, we concluded in *Latimer* that the trial court properly had sustained the administrator's determination that several personal care aides placed in the plaintiff's home by the Litchfield Hills Nurses Registry (registry) were the plaintiff's employees rather than independent contractors, in part because the plaintiff had failed to show that the aides were free from the plaintiff's control and direction. Id., 243–44, 252. We specifically concluded that among the factors militating in favor of finding control and direction were that the plaintiff retained the right to discharge any aide without liability, although this factor was not considered conclusive, paid aides an hourly rate, established the hours when the aides were to work after the aides made known their hours of availability, directed the aides to perform personal errands and to be cognizant of instructions concerning the plaintiff's care, expected the services to be rendered personally by particular aides selected by the registry on the basis of the plaintiff's needs and instructions conveyed to the registry, and furnished the equipment and materials required for the aides to perform their work. See id., 249–50. We also noted that the aides did not realize a

profit or suffer a loss based on the services they rendered. Id., 250. Even more important than the foregoing factors, however, was that the aides reported their daily activities to the plaintiff's attorney, to whom the plaintiff had granted a general power of attorney, and that the attorney personally monitored the level of care given to the plaintiff. Id. We explained that this finding embodied "the logical inference that the reporting and monitoring had a purpose and that, if the care given [to] the plaintiff [had been] unsatisfactory, [the attorney] could, and would, intervene and take corrective measures. That right of intervention . . . evinces a right to control and direct the [aides] by the recipient of their services." Id., 251. We added that "[t]he fact that the [aides] placed with the plaintiff by the registry signed an agreement that they were independent contractors [was] of no moment. Language in a contract that characterizes an individual as an independent contractor [rather than an employee] is not controlling. The primary concern is what is done under the contract and not what it says. . . . Such provisions in a contract are not effective to keep an employer outside the purview of the act when the established facts bring [the employer] within it. We look beyond the plain language of the contract to the actual status in which the parties are placed." (Citations omitted; internal quotation marks omitted.) Id., 251–52.

Shortly thereafter, in *Stone Hill Remodeling* v. *Administrator, Unemployment Compensation Act*, Superior Court, judicial district of Waterbury, Docket No. 089398 (February 21, 1991) (3 Conn. L. Rptr. 829), the Superior Court cited *Latimer* in concluding that the administrator reasonably could have found that a worker who performed plumbing, electrical, carpentry and siding work at a construction site for the plaintiff, who was a home improvement contractor, was under the plaintiff's general control and direction, at least with respect to the carpentry work that he had performed for the plaintiff. Id., 830. The court cited the board's findings that the worker "at times work[ed] side by side with the [plaintiff on the carpentry work]. The [plaintiff] furnished the worker with tools and materials, indicating an element of control . . . . The carpentry work performed by the [worker] was under the supervision of the [plaintiff]." Id., 829. The plaintiff thus failed to sustain its burden of demonstrating that the worker was free from its control and direction. See id., 830.

*Stone Hill Remodeling* was followed by *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, supra, 42 Conn. Supp. 376, whose reasoning we adopted one year later in upholding that decision. See *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, supra, 225 Conn. 102 ("we adopt the trial court's well reasoned decision as a statement of the facts and the applicable law on [the] issue [of the employer-employee relationship under the ABC test]"). In *Daw's Critical Care Registry, Inc.*, the Superior Court relied heavily on the factors discussed

in *Latimer* in reversing the decision of the Employment Security Division of the Department of Labor that nurses hired by the plaintiff to work at health-care facilities and hospitals on an as needed basis and at an hourly rate were the plaintiff's employees under the first prong of the ABC test. *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, supra, 42 Conn. Supp. 378, 384–85, 393–400. In concluding that the nurses in that case were not under the plaintiff's control and direction, the court relied on almost all of the factors we identified in *Latimer*. See id., 393–400. The court noted that, although the plaintiff retained the right to terminate an assignment without liability, other factors, including a lack of control and direction over the means and methods of the nurses' work at the medical facilities, meaning the right to direct what should be done and when and how it should be done, were more important. Id., 393–94. The court stated that "[the plaintiff's] function, after satisfying itself that a nurse was competent, was fairly limited to arranging times mutually convenient for the nurse and the particular medical facility where the nurse's services were to be rendered and examining a nurse's pay invoices when submitted to it for payment and in making payment. . . . Once the assignment to a particular medical facility was offered by [the plaintiff] and undertaken by . . . [the] nurse, the nurse went there and, subject to the protocol of that facility, rendered her professional services under that facility's direction. The . . . nurses could trade shifts after an assignment at a medical facility that [the plaintiff] serviced. This was done without the nurse being required to report such shift trades to [the plaintiff] . . . ." (Citation omitted; footnote omitted; internal quotation marks omitted.) Id., 394–95. Furthermore, unlike in *Latimer*, the plaintiff did not establish the hours when the nurses were to work and did not furnish the tools, equipment or materials necessary to do their job. See id., 395. In addition, the plaintiff did not send a representative to visit the medical facility to check on the nurses' work, did not conduct orientations for the nurses and did not issue the nurses a manual of instructions. Id., 396. Also weighing in favor of the plaintiff were that the name tags the nurses were required to wear in some facilities were not required by the plaintiff but by the facilities in which they worked. Id., 397.

The court acknowledged that other factors tended to indicate control and direction, including that the nurses submitted payment invoices to the plaintiff indicating the time and location of their work, the invoices were on forms provided by the plaintiff, the times indicated on the invoice forms needed to be certified by the facility before being processed by the plaintiff, and the nurses were paid at an hourly rate. Id. The court determined, however, that the manner of remuneration was " 'not decisive or controlling' " because of the "reality" that the plaintiff "served in the nature of [a] conduit

for payment." Id., 398. The court finally observed, citing *Latimer*, that the characterization of the nurses in their employment agreement with the plaintiff as independent contractors who were not subject to the plaintiff's control and direction was "entitled to some consideration . . . ." Id., 399.

This court again considered the issue of control and direction in *Tianti* v. *William Raveis Real Estate, Inc.*, 231 Conn. 690, 651 A.2d 1286 (1995). Although the plaintiff in *Tianti* brought the action pursuant to General Statutes § 31-72[5] on behalf of two real estate salespersons seeking to collect unpaid wages from the defendant, and not in the context of unemployment compensation; see id., 691–92; we stated that the ABC test was applicable in determining the existence of an employment relationship between the salespersons and the defendant. Id., 697. We then concluded that the defendant had the right to control its salespersons on the basis of findings that they "were required to attend mandatory office meetings . . . did business under the defendant's name . . . used the company letterhead, business cards and supplies . . . were required to attend training sessions . . . and . . . were threatened with discharge if they did not comply with these requirements. The right to terminate [an employment] relationship without liability is not consistent with the concept of an independent contract. . . . [One of the salespersons also] was required to put in specified hours of floor time and [the other salesperson] was required to work forty hours per week plus put in an office appearance on weekends." (Citation omitted; internal quotation marks omitted.) Id., 698; see also *AAD Vantage of South Central Connecticut, Inc.* v. *Administrator, Unemployment Compensation Act*, Superior Court, judicial district of New Haven, Docket No. CV-96-0382334 (September 16, 1998) (plaintiff exercised right to control salespersons because it provided them with equipment or materials necessary to perform job, including business cards, order forms, desk space and telephone service, plaintiff provided training prior to assigning territory to salespersons, plaintiff conducted sales meetings and provided salespersons with customer lists, plaintiff's income was dependent on salespersons securing sales, commissions were set by plaintiff according to fee structure it established, commissions were not paid until salespersons' clients paid plaintiff, salespersons could not bind plaintiff in contract or agreement without plaintiff's approval, salespersons were required to utilize plaintiff's order forms and submit forms to plaintiff, salespersons were not authorized to collect money from clients they secured, and, most important, plaintiff retained right to terminate salesperson who did not use best efforts to secure customers and could establish criteria to determine what constituted salesperson's best efforts).

The Superior Court addressed the issue more recently

in *JSF Promotions, Inc.* v. *Administrator, Unemployment Compensation Act*, supra, Superior Court, Docket No. CV-97-0575801. In reversing the board's decision and concluding that product demonstrators hired to work at supermarkets were not the plaintiff's employees, the court cited *Daw's Critical Care Registry, Inc.*, for the proposition that, because the plaintiff had served "as a mere conduit of information to enable the demonstrator to know what service to provide, what products were to be demonstrated, what equipment the demonstrator had to supply, where and what time the demonstrations were to be performed . . . [e]ven 'quality control' of the demonstrations was out of the plaintiff's hands—in that regard, it took its orders from the supermarket, which would make the judgment whether a particular demonstrator's work was satisfactory or not." Id. The court also observed that the demonstrator's contract allowed the demonstrator to assign work to be performed to other qualified demonstrators with notice to the plaintiff, which plainly meant that "the plaintiff [did] not even retain control over *who* [would] perform the demonstration service on any given job." (Emphasis in original.) Id.

Applying the foregoing principles, we conclude that the board's modified findings of fact did not reasonably support its conclusion that the plaintiff in the present case had the right to control the means and methods of the work performed by the installers/technicians during the years in question.[6] The plaintiff did not own or operate the tools, machinery or heavy duty vehicles required for the installation of heating systems, tank removal or home alarm installation. It thus contracted with the installers/technicians, who were licensed and certified to perform their services in accordance with state law and who routinely performed such work for their own businesses or through self-employment. The contracts between the plaintiff and the installers/technicians provided that the installers/technicians shall exercise independent judgment and control in the execution of any work they conduct for the plaintiff. See *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, supra, 42 Conn. Supp. 399 (plaintiff's characterization of nurses in employment agreement between them as not subject to plaintiff's control and direction was "entitled to some consideration," although not controlling). Consistent with this contract provision, the plaintiff did not supervise the installers/technicians and did not inspect their work. In fact, there was no representative of the plaintiff on a customer's premises at any time during an installation project, either while it was in progress or upon its completion. The same was true for the technicians. See id., 394–96 (rendering of nurses' services under facilities' direction and plaintiff's practice of not sending representative to check on nurses' work indicated absence of control and direction); cf. *Latimer* v. *Administrator, Unemployment Compensation Act,*

supra, 216 Conn. 250–51 (reporting by personal care assistants of daily activities to plaintiff's attorney, who personally monitored level of care given to plaintiff, indicated control and direction).

In addition, the installers/technicians were free to accept or reject any assignment offered to them without adverse consequences. Although an assignment, once accepted, had to be performed within a designated time-frame set by the plaintiff and the customer, the installers/technicians chose the days on which it was convenient for them to work. See *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, supra, 42 Conn. Supp. 394–95 (arranging times mutually convenient for nurses and medical facilities instead of establishing hours when nurses must work indicated absence of control and direction); cf. *Tianti* v. *William Raveis Real Estate, Inc.*, supra, 231 Conn. 698 (requiring salespersons to work specified hours indicated control and direction); *Latimer* v. *Administrator, Unemployment Compensation Act*, supra, 216 Conn. 250 (establishing hours when personal care assistants must work after they made hours of availability known to plaintiff indicated control and direction). Each of the installers/technicians also had an independent business that provided the same type of services that they provided for the plaintiff. As a consequence, many installers/technicians had their own business cards, advertised their businesses and earned an undetermined amount of their income from sources other than the plaintiff.

Furthermore, after an assignment was accepted, the installers/technicians used their own equipment and tools to complete each project. See *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, supra, 42 Conn. Supp. 395 (failing to furnish tools, equipment or materials necessary for nurses to perform their work indicated absence of control and direction); cf. *Tianti* v. *William Raveis Real Estate, Inc.*, supra, 231 Conn. 698 (furnishing equipment or materials to perform work indicated control and direction); *Latimer* v. *Administrator, Unemployment Compensation Act*, supra, 216 Conn. 250 (same). Although the installers/technicians were required to provide their services personally and were not permitted to subcontract or hire casual, pickup or day laborers, they could hire assistants to help them perform their work and could supervise the assistants as they saw fit. See *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, supra, 42 Conn. Supp. 394–95 (nurses' practice of trading shifts following assignment to facility without being required to report trades to plaintiff indicated absence of control and direction). Complaints regarding installation or other technical services and problems that arose during the warranty period originated with the customers and were referred to the plaintiff, who served as a conduit in reporting them to the installers/technicians and arranged for repairs or for payments by the installers/technicians to cover the cost

of repairs by others. Cf. *Latimer* v. *Administrator, Unemployment Compensation Act,* supra, 250–51 (direct monitoring by plaintiff's attorney of care given to plaintiff indicated control and direction).

On matters of training and attire, the plaintiff did not provide the installers/technicians with an employee handbook and did not pay for their training or require any specific training relating to its products. Installers were encouraged, but not required, to display the plaintiff's name on their clothing and utility vehicles. Security system installers were required to display photographic identification badges that described them as subcontractors, not as the plaintiff's employees. The plaintiff provided the installers/technicians with shirts and hats labeled "Standard Oil," but only because wearing these items might alleviate customer concern or confusion when the installers/technicians appeared at a customer's residence. Wearing the clothing was not required. See *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor,* supra, 42 Conn. Supp. 396–97 (failing to conduct orientation for nurses or to require name tags while nurses worked at facilities indicated absence of control and direction); cf. *Tianti* v. *William Raveis Real Estate, Inc.,* supra, 231 Conn. 698 (requiring salespersons to attend training sessions and to use company letterhead and business cards indicated control and direction).

The installers/technicians received compensation on the basis of a set rate per piece of work, rather than an hourly rate, could realize a profit or loss from the services rendered, and paid for their own transportation without reimbursement by the plaintiff. Cf. *Latimer* v. *Administrator, Unemployment Compensation Act,* supra, 216 Conn. 250 (paying personal care assistants hourly rate and fact that they did not realize profit or suffer loss based on services indicated control and direction).

Although the installers/technicians remitted invoices to the plaintiff, we do not agree with the court in *Daw's Critical Care Registry, Inc.,* that this is indicative of control and direction. It is independent contractors, rather than employees, who typically submit invoices for their work. Neither the legal nor the ordinary definition of the term suggests that an employee is paid on the basis of an invoice. See Black's Law Dictionary (10th Ed. 2014) p. 956 (defining "invoice" as "[a]n itemized list of goods or services furnished by a seller to a buyer, usu[ally] specifying the price and terms of sale; a bill of costs"); Webster's Third New International Dictionary (2002) p. 1190 ("an itemized statement furnished to a purchaser by a seller and usu[ally] specifying the price of goods or services and the terms of sale"). Moreover, references in Connecticut case law to the payment of invoices consistently appear in connection with payments made to contractors rather than to employees. See, e.g., *Campisano* v. *Nardi,* 212 Conn. 282, 286, 562

A.2d 1 (1989) (referring to money applied to payment of subcontractors based on invoices submitted and shown to plaintiffs); *Ray Weiner, LLC* v. *Connery*, 146 Conn. App. 1, 4, 75 A.3d 771 (2013) (referring to "invoices and moneys charged by subcontractors"); *D'Angelo Development & Construction Corp.* v. *Cordovano*, 121 Conn. App. 165, 189, 995 A.2d 79 (referring to invoices substantiating amounts claimed to be owed to subcontractors), cert. denied, 297 Conn. 923, 998 A.2d 167 (2010). The submission of invoices in this case is therefore indicative of the absence of control and direction.

We acknowledge the board's finding that five installers/technicians indicated in a questionnaire that the plaintiff had the right to direct how they performed their work. Although the board did not credit subsequent testimony by two of the five installers/technicians that the plaintiff had no such right, the statements in the questionnaires do not outweigh the board's numerous other findings in support of the conclusion that the plaintiff did not exercise control and direction over the installers/technicians.

The defendant argues that the plaintiff made arrangements with its customers regarding all of the installations and services, scheduled installation and service appointments with its customers and, *in the event the installers/technicians accepted assignments*, required them to perform their work within a designated timeframe set by the plaintiff and its customers. This argument, however, ignores the board's finding that the installers/technicians could accept or reject assignments simply on the basis of convenience and, as a consequence, had full control over how much work they did and when they did it. See *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, supra, 42 Conn. Supp. 394 (plaintiff had no control over nurse's assignment because plaintiff's function, "after satisfying itself that a nurse was 'competent,' was fairly limited to arranging times mutually convenient for the nurse and the particular medical facility [at which] the nurse's services were to be rendered"); cf. *Latimer* v. *Administrator, Unemployment Compensation Act*, supra, 216 Conn. 250 (plaintiff had control over personal care assistants because "[they] made known their hours of availability, [and] the plaintiff . . . established the hours when they were to work").

The defendant also refers to evidence that the installers/technicians were limited to providing the installation or service they were sent by the plaintiff to perform, were not allowed to perform additional services without permission or direction from the plaintiff, and were required to perform the services personally insofar as they were not permitted to subcontract or use casual, pickup or day laborers when working in customers' homes. We disagree that these findings constitute evi-

dence of control and direction. The fact that the installers/technicians were limited to performing only those services they were sent to perform and were not permitted to provide additional services without the plaintiff's permission has no bearing on whether the plaintiff exercised control and direction over the manner in which they performed the services they were contracted to perform. The contracts between the plaintiff and the installers/technicians defined their legal relationship, and it is the work that was required under the contractual relationship that must be examined to determine whether the installers/technicians were employees or independent contractors under the act. As for the plaintiff's restriction on the use of subcontractors or possibly unqualified workers to assist in performing the work, this restriction was more than overcome by the board's related finding that the installers/technicians were free to hire other presumably qualified workers to assist them in completing the project and could supervise these workers *as they saw fit*. Thus, given that the plaintiff never visited its customers' homes, it very likely never knew when the installers/technicians hired assistants or what the assistants did.

The defendant finally contends that the plaintiff supplied the installers/technicians with the means to do their work because the plaintiff determined the equipment to be installed for each project, required the installer to use parts supplied by the plaintiff, replaced some of the parts provided by the installers/technicians or reimbursed them for the parts. These parts included nozzles and strainers provided to the installers/technicians who serviced customers lacking heat or who needed their furnaces cleaned, and wires and "everything down to the screws" provided to security system installers. We do not agree that these facts constitute evidence of control and direction. The defendant blurs the line between the product that requires installation and the tools and equipment necessary to perform the installation. The board specifically found that the installers used their own equipment and tools to complete each project and that the installer did not pay for the product to be installed, which was provided by the plaintiff. The same was true for the technicians. Thus, insofar as the plaintiff supplied specialized parts such as nozzles and strainers in the case of heating equipment, or the special wires and screws required for the installation of security systems, those parts were more accurately understood as part of the product, especially in the case of security systems that required special wiring. The only exception appears to be the piping, tubing, fittings and cement necessary for boiler installation, which the board found were supplied by the boiler installers.

In sum, the defendant focuses on almost everything except the board's findings regarding the relevant provisions of the contract agreements between the plaintiff

and the installers/technicians, and the means and methods used by the installers/technicians in performing their actual work. With respect to the former, the contract agreement provided that the installers/technicians "shall at all times exercise independent judgment and control in the execution of any work, job or project they accept." With respect to the latter, the board found that the installers/technicians, who were licensed and certified in accordance with state law, were not trained by the plaintiff. In addition, they did not operate under an instruction manual provided by the plaintiff, they were not supervised by the plaintiff at the customers' homes, their work was not inspected by the plaintiff, there was no representative of the plaintiff on the customers' premises at any time during the installation projects, either while they were in progress or upon their completion, they were free to accept or reject any assignment and thus could choose the days on which they worked, they were paid on the basis of a set rate per project, they could realize a profit or loss depending on the difficulty of the particular job, they used their own equipment and tools to complete each project, and they were permitted to hire assistants whom they could supervise. Although the plaintiff imposed certain limitations on the installers/technicians, these limitations did not affect the manner in which they performed their work at the homes of the plaintiff's customers. In fact, the installers/technicians appeared to be in full control of their work at the customers' homes, and, to the extent the installers/technicians were monitored, they were not monitored by the plaintiff but by the customers, who were responsible for informing the plaintiff regarding any problems that arose in connection with an installation. Accordingly, we conclude that the plaintiff satisfied its burden of showing that the installers/technicians were free from its control and direction under part A of the ABC test.[7]

## II

The plaintiff next claims that the trial court improperly interpreted the term "places of business" under part B of the ABC test. The plaintiff specifically contends that the trial court's interpretation of the phrase as including the sites of service, that is, the homes of its residential customers, was unreasonably broad, inconsistent with the purpose of the act, and would have the practical effect of preventing the plaintiff or any other Connecticut business from ever utilizing the services of an independent contractor. The defendant responds that the court properly agreed with the board that the plaintiff's place of business was not only the plaintiff's office, but the individual homes at which the plaintiff contracted to provide services to its customers. We agree with the plaintiff.

The following additional facts are relevant to our resolution of this claim. In concluding that the services

of the installers/technicians were not performed outside the plaintiff's places of business, the board explained: "The [plaintiff] contracts directly with its customers to provide installation of its heating and cooling equipment and security systems in the customers' homes and to continue to service the equipment and monitor the security systems. . . . [T]he [plaintiff's] customer's homes have, by contract, become places of business of the [plaintiff] for purposes of part B of the ABC test. . . . [T]he [installers/technicians] represent the [plaintiff's] interest[s] when they are in the homes of the [plaintiff's] customers, and the [plaintiff] profits from the services that are performed in its customers' homes. . . . [T]he [plaintiff] does not merely broker contractor services but, rather, offers installation and servicing of heating and cooling equipment and security systems to the public. Moreover . . . the [plaintiff] contracts directly with the customers whose homes are the situs for the installers' and technicians' services."

In responding to the plaintiff's claim that it would be impossible to utilize the services of an independent contractor under the board's interpretation of part B, the board further explained: "[T]he [plaintiff] advertises and sells installed heating and cooling equipment and security systems. It rarely sells equipment without also selling the installation of that equipment. Moreover, the [plaintiff] has long-term contracts with its customers to service its heating and cooling equipment and monitor its security systems. Therefore . . . the [plaintiff] . . . conducts an integral part of its business in [the] customers' homes."

Following a review of the board's decision, the trial court examined the case law of other jurisdictions and concluded that "the board properly determined that the customers' locations were . . . place[s] of business of the plaintiff. The plaintiff engages the installers/[technicians] to perform certain tasks as part of a continuing provision of services at the customers' locations. Some of these tasks overlap with those performed by employees. Others are performed predominantly, and possibly exclusively, by putative independent contractors, but, nonetheless, the tasks are part of ongoing activity at the [customers'] location[s]." (Emphasis omitted.)

Whether the homes of the plaintiff's customers are "places of business" within the meaning of § 31-222 (a) (1) (B) (ii) (II) presents an issue of statutory interpretation. "The proper construction of this statute is a question of law over which we exercise plenary review. . . . When interpreting a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous

and does not yield absurd or unworkable results, extra-textual evidence of the meaning of the statute shall not be considered. General Statutes § 1-2z. . . . However, [w]hen a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . A statute is ambiguous if, when read in context, it is susceptible to more than one reasonable interpretation. . . .

"We recently have elaborated on the role of agency interpretations in cases involving questions of statutory construction. In such cases, the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . . Conversely, an agency's interpretation of a statute is accorded deference when the agency's interpretation has been formally articulated and applied for an extended period of time, and that interpretation is reasonable. . . . Deference is warranted in such circumstances because a time-tested interpretation, like judicial review, provides an opportunity for aggrieved parties to contest that interpretation. Moreover, in certain circumstances, the legislature's failure to make changes to a long-standing agency interpretation implies its acquiescence to the agency's construction of the statute. . . . For these reasons, this court long has adhered to the principle that when a governmental agency's time-tested interpretation [of a statute] is reasonable it should be accorded great weight by the courts." (Citations omitted; internal quotation marks omitted.) *Tuxis Ohr's Fuel, Inc.* v. *Administrator, Unemployment Compensation Act*, supra, 309 Conn. 421–23.

Part B of the ABC test provides that "[s]ervice performed by an individual shall be deemed to be employment subject to this chapter . . . unless and until it is shown to the satisfaction of the administrator that . . . such service . . . is performed outside of all the places of business of the enterprise for which the service is performed . . . ." General Statutes § 31-222 (a) (1) (B) (ii) (II). Although the statute makes clear that individual job sites are not necessarily synonymous with "the places of business of the enterprise for which the service is performed"; General Statutes § 31-222 (a) (1) (B) (ii) (II); there is no definition of "places of business" in the act to assist in understanding this distinction. We thus seek guidance from the statute's legislative history.

Section 31-222 (a) (1) (B) (ii) and several other amendments to the act were adopted by the legislature in 1971 to ensure compliance with the federal Employ-

ment Security Amendments of 1970, Pub. L. No. 91-373, 84 Stat. 695. See 14 H.R. Proc., Pt. 9, 1971 Sess., p. 4054, remarks of Representative Dominic J. Badolato. In fact, the legislature adopted language in § 31-222 (a) (1) (B) (ii) (II) that was "suggested by the United States Department of Labor . . . ." Conn. Joint Standing Committee Hearings, Labor and Industrial Relations, 1971 Sess., p. 293. Other than a few fleeting references to this detail in the committee hearings and the legislative debate, however, there is no other discussion of the statutory language in the legislative history.

A related provision on the nonvoluntary liability of employers under the act, however, is contained in General Statutes § 31-223. That statute provides that, to determine whether an employer has a particular number of employees at any point in time for purposes of the act, any contractor or subcontractor who performs work for an employer shall be considered an employee under the act if the work "is part of [the] employer's usual trade, occupation, profession or business, and . . . is performed in, on or about the premises under such employer's control, [even] if such contractor or subcontractor shall not be subject to [the act] . . . ." General Statutes § 31-223 (a) (9) (B). The two principal criteria used to determine whether an independent contractor or subcontractor may be deemed an employee under this provision, namely, whether the contractor's or subcontractor's work is (1) in furtherance of the employer's usual course of business, and (2) is performed in, on or around premises "under such employer's control," are nearly identical to the two prongs described in part B of the ABC test in § 31-222 (a) (1) (B) (ii) (II).

The importance of this confluence of language pertaining to the places where independent contractors perform their work cannot be underestimated. In construing multiple statutes on the same subject, "we are guided by the principle that the legislature is always presumed to have created a harmonious and consistent body of law . . . . Legislation never is written on a clean slate, nor is it ever read in isolation or applied in a vacuum. Every new act takes its place as a component of an extensive and elaborate system of written laws. . . . Construing statutes by reference to others advances [the values of harmony and consistency within the law]. In fact, courts have been said to be under a duty to construe statutes harmoniously where that can reasonably be done. . . . Moreover, statutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant . . . ." (Citations omitted; internal quotation marks omitted.) *Nizzardo* v. *State Traffic Commission*, 259 Conn. 131, 157–58, 788 A.2d 1158 (2002). Thus, the most harmonious reading of the two provisions would be to construe "places of business," as used in § 31-222 (a) (1) (B) (ii) (II), in light of the more specific definition

provided in § 31-223 (a).

Nevertheless, because of the difference in language, we do not deem § 31-223 (a) (9) (B) to be dispositive at this early stage of our analysis but also consider other interpretive tools. It is well established that "[w]here a statute does not define a term it is appropriate to look to the common understanding expressed in the law and in dictionaries." *Caldor, Inc.* v. *Heffernan*, 183 Conn. 566, 570–71, 440 A.2d 767 (1981). Common dictionaries contain no definition of the term "place of business." Black's Law Dictionary, however, defines "place of business" as "[a] location at which one carries on a business." Black's Law Dictionary, supra, p. 1334. A "business" is further defined as "[a] commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain." Id., p. 239. Both of these definitions, however, lack the specificity required to be of value in the present context.

There is likewise no long-standing agency interpretation of the phrase to assist in determining when services are performed outside the places of business of the enterprise. Rather, the board has reached different conclusions based on the facts and circumstances of individual cases. See, e.g., *Benitz* v. *Administrator, Unemployment Compensation Act*, Employment Security Appeals Division, Board of Review, Case No. 9004-BR-10 (October 7, 2010) (customers' homes were not considered places of business for purposes of antenna dish installation because, even though enterprise controlled scheduling, performance and financial aspects of installers' services, customers entered into contracts for installation with enterprise contractor rather than enterprise); *Alward* v. *Administrator, Unemployment Compensation Act*, Employment Security Appeals Division, Board of Review, Case No. 9008-BR-93 (June 20, 1995) (party and entertainment sites were not considered places of business because enterprise planned and coordinated parties and events by telephone from home office and did not manage or control performance of services at party or entertainment sites); *Greatorex* v. *Administrator, Unemployment Compensation Act*, Employment Security Appeals Division, Board of Review, Case No. 1169-BR-88 (January 9, 1989) (construction sites secured by contract were considered places of business because enterprise was licensed as home improvement contractor and subcontractors performed electrical and plumbing services at same sites at which enterprise's employees performed carpentry services).[8] As a consequence, it is difficult to derive any general principles from the agency's interpretations that would be helpful in the present case.

We thus turn to two Superior Court cases that have interpreted "places of business" under part B of the ABC test.[9] In *JSF Promotions, Inc.* v. *Administrator, Unemployment Compensation Act*, supra, Superior

Court, Docket No. CV-97-0575801, the court concluded that the services of product demonstrators, who entered into contracts with the plaintiff to work in supermarkets, were performed outside the plaintiff's place of business. The court stated that the supermarkets were entirely separate enterprises from that of the plaintiff and that the plaintiff's business was "essentially to serve as a broker or intermediary between the supermarkets, the manufacturers, and the demonstrators. . . . As such, [the plaintiff's] place of business is not the supermarkets where the demonstrators work but, rather, where the plaintiff does its own work, that is, in its own office." Id. Similarly, in *Daw's Critical Care Registry, Inc.*, the court concluded that nurses who contracted with the plaintiff to provide nursing care on a temporary basis to various health-care facilities did not work at the plaintiff's place of business following assignment to the client's location because the plaintiff was not in the business of providing patient care but of brokering nursing personnel. *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, supra, 42 Conn. Supp. 402. The court explained that nursing services were a function beyond what the plaintiff held itself out as performing, and, therefore, the client locations where services were performed were not within the plaintiff's business enterprise. Id., 403. These two decisions, however, like the agency's decisions, are highly fact specific and do not purport to define "places of business" in a manner that would be generally applicable in other contexts.

In the absence of a time-tested agency interpretation or any clear agreement on a defining principle in the Superior Court decisions, it has been our practice to examine the case law of other jurisdictions that have adopted the ABC test. See *JSF Promotions, Inc.* v. *Administrator, Unemployment Compensation Act*, supra, 265 Conn. 421–22. A review of these cases, however, reveals a similar lack of consensus. Some courts have concluded that services performed at sites other than the office locations of the enterprise or its physical plant are not places of business because the business functions as a broker and the services performed at the sites are not an integral part of the enterprise or because treating them as places of business would have unacceptable economic consequences, such as higher business costs. See, e.g., *Sinclair Builders, Inc.* v. *Unemployment Ins. Commission*, 73 A.3d 1061, 1065, 1067, 1072–73 (Me. 2013) (job sites at which workers performed carpentry, plumbing, heating, electrical and other services for construction company were not places of business because, although employer's place of business may include location where employer has significant and business-related presence, extending places of business to construction job sites would preclude construction companies from satisfying part B of ABC test when hiring independent contractors and thus

have negative economic effects on construction industry, which would be inconsistent with legislature's intent); *Athol Daily News* v. *Board of Review*, 439 Mass. 171, 179, 786 N.E.2d 365 (2003) (geographic areas covered by carriers for newspaper delivery enterprise were not places of business because, although carriers picked up newspapers at company's distribution center, delivery locations such as homes, stores, bundle drops and vending machines were "outside of premises owned by the [enterprise] or which could fairly be deemed its 'places of business' "); *Commissioner of the Division of Unemployment Assistance* v. *Town Taxi of Cape Cod, Inc.*, 68 Mass. App. 426, 431, 862 N.E.2d 430 (2007) (geographic area covered by drivers for taxicab enterprise were not places of business because, even though taxicabs were stored and dispatch system was operated at business premises, drivers "did not transport customers on those premises . . . were not confined to a specific geographical location and were free to choose locations where they would look for passengers" [citation omitted]); *Burns* v. *Labor & Industrial Relations Commission*, Missouri Court of Appeals, Docket No. WD 44749 (Mo. App. March 31, 1992) (job sites at which roofers worked for roofing enterprise were not places of business because only place of business was home of business owner), aff'd, 845 S.W.2d 553 (Mo. 1993); *Metro Renovation, Inc.* v. *Dept. of Labor*, 249 Neb. 337, 347, 543 N.W.2d 715 (1996) (rejecting rationale that job sites at which tradespeople performed construction work for remodeling and renovation enterprise were places of business because it would preclude any construction company from meeting requirements of law and render worksite "meaningless as a test to determine what constitutes an independent contractor in the construction industry"); *Carpet Remnant Warehouse, Inc.* v. *Dept. of Labor*, 125 N.J. 567, 592, 593 A.2d 1177 (1991) (homes where installers performed services for carpet company were not places of business because phrase "refers only to those locations where the enterprise has a physical plant or conducts an integral part of its business"); *Barney* v. *Dept. of Employment Security*, 681 P.2d 1273, 1275 (Utah 1984) (construction sites at which nailers and finishers performed services for drywall contracting enterprise were not places of business because owner had home office, nailers and finishers could work at other locations during day, including private residential sites, and, "[i]f the job-site definition of 'places of business' were to be utilized for construction workers, any unemployment question involving a subcontractor on a construction site would result in coverage under the [Utah Employment Security Act, which] is not the intent of [that] act").

In contrast, other courts have extended the meaning of "places of business" beyond headquarters, office premises or physical plants to locations such as homes, roadways, transportation routes, or logging and con-

struction sites because they have concluded that representation of the interest of the enterprise by workers at these locations renders them places of business. Under this broad interpretation, places of business may include the entire area in which the enterprise's business is conducted. See, e.g., *Clayton* v. *State*, 598 P.2d 84, 86 (Alaska 1979) (state owned parcel where workers harvested timber for enterprise involved in processing lumber was place of business because enterprise had contract to harvest timber on logging site); *Mamo Transportation, Inc.* v. *Williams*, 375 Ark. 97, 101, 103, 289 S.W.3d 79 (2008) (roadways on which workers drove vehicles were places of business for enterprise that provided " 'drive-away' service" by transporting customers' vehicles from origin to destination throughout United States and Canada because place of business is "the place where the enterprise is performed," and enterprise for which service of transporting vehicles is performed takes place "in the vehicle itself between the point of origin and the point of destination"); *TNT Cable Contractors, Inc.* v. *Director, Dept. of Workforce Services*, Arkansas Court of Appeals, Docket No. E-14-224 (Ark. App. February 11, 2015) (cable installation sites and connecting roadways were places of business for enterprise providing cable installation and other technical services because they were places where services were performed); *Home Care Professionals of Arkansas, Inc.* v. *Williams*, 95 Ark. App. 194, 199, 235 S.W.3d 536 (2006) (homes where workers took care of elderly clients for home care referral enterprise were places of business because "the representation of an entity's interest by an individual on a premises renders the premises a place of the employer's business," and caregivers represented enterprise's stated interests of providing home care for elderly while in client's homes, which resulted in profits for enterprise); *Carpetland U.S.A., Inc.* v. *Dept. of Employment Security*, 201 Ill. 2d 351, 391, 776 N.E.2d 166 (2002) (customers' homes where workers took measurements for floor covering enterprise were places of business because "place of business extends to any location where workers regularly represent its interest," and, thus, when measurers visit customers' premises to take measurements necessary for quoting prices and closing sales, they represent enterprise's interests); *L.A. McMahon Building Maintenance, Inc.* v. *Dept. of Employment Security*, 32 N.E.3d 131, 142 (Ill. App. 2015) (customers' homes where workers washed windows for enterprise providing window washing services were places of business because "[a]n employing unit's place of business extends to any location where workers regularly represent its interests," and window washers represented enterprise interests when they worked at customers' homes); *Chicago Messenger Service* v. *Jordan*, 356 Ill. App. 3d 101, 115–16, 825 N.E.2d 315 (roadways on which workers drove vehicles were places of business for enterprise providing courier service involving pick up

and delivery of packages from one location to another), appeal denied, 215 Ill. 2d 594, 833 N.E.2d 1 (2005); *McPherson Timberlands, Inc.* v. *Unemployment Ins. Commission*, 714 A.2d 818, 823 (Me. 1998) (logging sites at which worker harvested timber for timber management and marketing enterprise were places of business because enterprise had "significant and business-related presence at the location" due to its "contractual relationship with the landowner, its interest in the timber on the property, and its physical presence on the property," and, accordingly, "the property was within [the] business territory [of the enterprise]"); *Vermont Institute of Community Involvement, Inc.* v. *Dept. of Employment Security*, 140 Vt. 94, 99, 436 A.2d 765 (1981) (offsite locations where adjunct faculty taught courses for educational institution were places of business even though they were outside home office because places of business include "the entire area in which [the institution] conducts [its] business").

Even if we limit our review to cases in which services were performed at customers' homes, courts have reached different conclusions, with one jurisdiction concluding that homes were not places of business for the purpose of carpet installation; *Carpet Remnant Warehouse, Inc.* v. *Dept. of Labor*, supra, 125 N.J. 592; and two other jurisdictions concluding that homes were places of business for the purpose of providing home care to elderly clients; *Home Care Professionals of Arkansas, Inc.* v. *Williams*, supra, 95 Ark. App. 199; measuring the premises for floor covering; *Carpetland U.S.A., Inc.* v. *Dept. of Employment Security*, supra, 201 Ill. 2d 391; and window washing. *L.A. McMahon Building Maintenance, Inc.* v. *Dept. of Employment Security*, supra, 32 N.E.3d 142.

We conclude, on the basis of our review of the case law and our examination of the broader statutory scheme, that two principles should govern our construction of part B of the ABC test. The first principle relates to the harmonious construction of related statutes. As previously discussed, the statutory scheme has provided for nearly eighty years, well before the legislature adopted the ABC test in 1971, that an independent contractor may be considered an employee under the act if the contractor worked "on or about the premises under such employer's control . . . ." General Statutes § 31-223 (a) (9) (B). Thus, in order to effect a harmonious interpretation of §§ 31-222 (a) (1) (B) (ii) (II) and 31-223 (a) (9) (B), a reviewing court should consider the extent to which the employer exercised control over the location where the independent contractor worked when construing part B of the ABC test. The fact that the language in the two provisions is not identical is of little import. The language used in the ABC test was adopted in order to comply with federal law and was suggested by the United States Department of Labor, and there is no evidence that the legislature understood

that language as broadening the criteria under which an independent contractor could be considered an employee beyond the criteria that had existed for more than thirty years under § 31-223 (a).[10]

The second principle relates to the conjunctive nature of the test, which suggests that no one part of the test should be construed so broadly—and, therefore, made so difficult or impossible to meet—that the other two parts of the test are rendered superfluous. Under this principle, we reject the broad interpretation adopted by some of our sister states that the meaning of "places of business" in the present context should extend to all locations where the installers/technicians performed their services; see *Mamo Transportation, Inc.* v. *Williams*, supra, 375 Ark. 101, 103; or regularly represented the interests of the plaintiff; see *Carpetland U.S.A., Inc.* v. *Dept. of Employment Security*, supra, 201 Ill. 2d 391; because doing so would make it far more difficult for employers to satisfy part B of the test when they hire independent contractors to work at locations apart from their offices or physical plants. See *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, supra, 42 Conn. Supp. 389–90 ("[t]he exemption [under the act] becomes meaningless if it does not exempt anything from the statutory provisions . . . where the law and the facts merit the exemption in a given case" [citation omitted; internal quotation marks omitted]). The fact that part B provides a choice between two alternative criteria that may be satisfied by employers who seek to challenge application of the act does not resolve the problem created by an overly broad interpretation of the term "places of business." The choice is provided precisely because the burden of proof required under the test is so difficult to sustain. Adopting a broad interpretation of part B would deprive employers of that choice and, in some cases, could make the exemption provided under the ABC test meaningless by increasing this already heavy burden.

We therefore conclude that the meaning of "places of business" in the present context should not be extended to the homes in which the installers/technicians worked, unaccompanied by the plaintiff's employees and without the plaintiff's supervision. The homes of the plaintiff's customers, unlike the plaintiff's business offices, warehouses and other facilities, were under the homeowners' control. Regardless of whether the plaintiff "conduct[ed] an integral part of its business in customers' homes," as noted by the board, it was not the plaintiff but the homeowners who (1) determined when access to their homes was convenient, (2) brought the installers/technicians to locations inside their homes and elsewhere on their property where equipment was to be installed, and (3) identified problems with the installation process or with the newly installed equipment during the warranty period. Accordingly, we conclude that the homes of the plain-

tiff's customers were not "places of business" under part B of the ABC test.

This interpretation not only comports with our well established case law on the distinction between an employee and an independent contractor, and with the related statutory provision in § 31-223 (a) (9) (B), but is consistent with the defendant's published guidelines for determining the status of workers as independent contractors or employees under § 31-222 (a) (1) (B) (ii) (II). The Unemployment Compensation Tax Division, which operates within the Department of Labor (department), publishes a document entitled "Self-Assessment of the Employer-Employee Relationship for CT Unemployment Taxes," which is "designed to allow [the enterprise] to perform a self-examination of the status of workers in [the enterprise] whom [it] consider[s] to be independent contractors." Unemployment Compensation Tax Division, Employment Security Division, "Self-Assessment of the Employer-Employee Relationship for CT Unemployment Taxes," p. 1, available at https://www.ctdol.state.ct.us/uitax/abctest.doc (last visited February 25, 2016). The section pertaining to part B of the ABC test instructs in capital letters and boldface type that "Answering Either of These Questions ['No'] Will Satisfy This Test." Id., p. 4. The second question, which is described as the factor relating to "Outside Employer's Premises," then asks: "Does the individual perform any of the work on the firm's premises?" Id. This language indicates not only that the department has traditionally understood places of business as premises controlled by the enterprise, but that business entities have been operating under the same understanding, and, therefore, any departure from this view in the present case would require a change in department practice.

We also avoid a broad interpretation of "places of business" in the present context because of certain undesirable, practical consequences that might follow, including the taxing of two different business entities for the same worker and the receipt of benefits by the unemployed worker from both entities, as when an enterprise hires an independent contractor who operates a sole proprietorship, partnership, limited liability company or corporation that also pays unemployment contribution taxes for workers it sends to perform services for another enterprise. Furthermore, it makes no sense for an individual's home to be considered a place of business when the enterprise has no office in the home and the sanctity of the home and the privacy interests of its residents have long been recognized in our jurisprudence. See, e.g., *Simms* v. *Chaisson*, 277 Conn. 319, 334–35, 890 A.2d 548 (2006). Finally, as the Connecticut Business and Industry Association, Inc., argues in its amicus brief, a broad interpretation in this context could turn every Connecticut household into a place of business for any company that performs

services at a customer's home, thus profoundly limiting an employer's ability to subcontract work.

The dissent's heavy reliance on the fact that we have declared the statute remedial in prior cases is insufficient reason to conclude that the homes of the plaintiff's customers are places of business under § 31-222 (a) (1) (B) (ii) (II). The United States Supreme Court has concluded that the term "remedial" is vastly overused and often is misunderstood because "almost every statute might be described as remedial in the sense that all statutes are designed to remedy some problem. And even if the [United States Supreme] Court identified some subset of statutes as especially remedial, the [c]ourt has emphasized that no legislation pursues its purposes at all costs. *Rodriguez* v. *United States*, 480 U.S. 522, 525–26, 107 S. Ct. 1391, 94 L. Ed. 2d 533 (1987) . . . . [Legislative] intent is discerned primarily from the statutory text." (Internal quotation marks omitted.) *CTS Corp.* v. *Waldburger*,    U.S.    , 134 S. Ct. 2175, 2185, 189 L. Ed. 2d 62 (2014). In other words, "the plain meaning of the statute and the role of legislative compromise restrain the application of the remedial canon of statutory interpretation." *Waldburger* v. *CTS Corp.*, 723 F.3d 434, 452 (4th Cir.) (Thacker, J., dissenting), rev'd,    U.S.    , 134 S. Ct. 2175, 189 L. Ed. 2d 62 (2014). As one federal court has cogently noted, "[s]tatutes do more than point in a direction . . . . They achieve a particular amount of [their] objective, at a particular cost in other interests. An agency cannot treat a statute as authorizing an indefinite march in a single direction. [N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law. *Rodriguez* v. *United States*, [supra, 525–26] . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Contract Courier Services, Inc.* v. *Research & Special Programs Administration*, 924 F.2d 112, 115 (7th Cir. 1991). Rather, "after [it is] determine[d] that a law favors some group, the question becomes: How much does it favor them? Knowing that a law is remedial does not tell a court how far to go. Every statute has a stopping point, beyond which, [the legislature has] concluded, the costs of doing more are excessive—or beyond which the interest groups opposed to the law were able to block further progress. A court must determine not only the direction in which a law points but also how far to go in that direction." (Emphasis omitted.) *Stomper* v. *Amalgamated Transit Union, Local 241*, 27 F.3d 316, 320 (7th Cir. 1994), citing *Rodriguez* v. *United States*, supra, 525–26. In the present case, the ABC test provides for such a stopping point, and the underlying remedial purpose of the act as a whole

should not be invoked to interfere with the legislature's intent of exempting employers from their obligation to pay unemployment taxes when they hire independent contractors to perform work for the enterprise. In other words, because all portions of a statute are not intended to have a remedial effect, the application of the remedial canon of statutory interpretation should be restrained in order to effectuate the legislative compromise represented by the exemption provision in § 31-222 (a) (1) (B) (ii) (II). See, e.g., *Waldburger* v. *CTS Corp.*, supra, 452 (Thacker, J., dissenting).

Having determined that the plaintiff's places of business did not extend to the homes of its residential customers, we conclude that the trial court improperly upheld the board's determination that the plaintiff failed to satisfy part B of the ABC test.[11]

The judgment is reversed and the case is remanded with direction to render judgment sustaining the plaintiff's appeal.

In this opinion EVELEIGH, ESPINOSA and ROBINSON, Js., concurred.

[1] Because we reach our conclusions on the basis of the board's modified factual findings, we need not consider the plaintiff's claim that the trial court applied the wrong legal standard in deciding the motion to correct.

[2] The board's modified findings are as follows:

"1. [The plaintiff] is primarily in the business of home heating oil delivery. It also advertises and sells heating and cooling equipment, and the installation, maintenance and repair of such equipment. For example, [the plaintiff] advertises its twenty-four hour or 'no heat' call service. In addition, [the plaintiff] advertises and sells home security alarm systems, and the installation, maintenance, and monitoring of such systems. [The plaintiff] specifically advertises the sale of installed heating and cooling equipment and security systems, and it contracts directly with its customers regarding that installation.

"2. Approximately 90 [percent] of [the plaintiff's] business is generated from its home heating oil delivery service. The remaining [10 percent] of the business results from its heating and cooling system installation and repair, home alarm system installation and maintenance and its service work, which is routinely part of the service contracts it offers its customers. The [plaintiff] advertises home heating oil delivery, heating and cooling installation, monitoring and maintenance, tank removal, service work and home alarm system installation to its customers and potential customers in the yellow pages.

"3. [The plaintiff] does not own or operate the tools, machinery or heavy duty vehicles required to install heating systems, tank removal or home alarm installation. As a result, it 'contracts' the work [out] to individuals who routinely perform such work either for their own business or self employment. The vast majority of the heating and cooling equipment and security systems sold by [the plaintiff] are installed by the installers on behalf of [the plaintiff]. After installation, [the plaintiff] has long-term arrangements with its customers to service the heating and cooling equipment and to provide monitoring of the security systems.

"4. Heating and cooling installation, home alarm installation, and tank removal are performed by a variety of individuals who either own their own business and/or are self-employed (installers). Service and maintenance work on the heating and cooling systems are performed by a variety of individuals who either own their own business and/or are self-employed (service technicians). The installers and technicians are licensed or certified to perform their services in accordance with state law.

"5. Installers are neither supervised by [the plaintiff] nor does [the plaintiff] inspect their work. There is no representative of [the plaintiff] on the premises at any time during the installation project while it is in progress [or] upon its completion. The same is applicable to the technicians.

"6. [The plaintiff] determines the equipment to be installed for each project

and requires the installer to use the parts supplied by [the plaintiff]. On occasion, the installer may supplement with its own/other parts as deemed necessary to be reimbursed or replaced by [the plaintiff]. Installers use their own equipment and tools to complete each project. The installer does not pay for the equipment installed on the project, which is provided by [the plaintiff]. The same is applicable to the technicians. The installers and technicians also provide and pay for their own transportation without reimbursement by [the plaintiff]. The boiler installers [supply] piping, tubing, fittings and cement as necessary for boiler installations, in addition to the parts that [the plaintiff] supplies and requires the installers to use. [The plaintiff] provided nozzles and strainers to individuals who serviced customers who had no heat or needed their furnaces cleaned. The security system installers receive from [the plaintiff] wires and 'everything down to the screws,' and they supply no parts at all.

"7. The installers and technicians are free to accept or reject any assignment which is offered to them, and can determine [on what] days they will perform services for [the plaintiff].

"8. [The plaintiff] bills each customer and accepts payment to [the plaintiff] for installation and service work. Neither the installers nor the technicians bill or accept payment from the customer.

"9. Installers and technicians are encouraged to display [the plaintiff's] name on their clothing (shirts, hats), and the utility vehicles they use to perform their work. [The plaintiff] requires the security system installers to display photo badges which identify them as subcontractors of [the plaintiff]. The installers and technicians are not required to display the [plaintiff's] name on their apparel or vehicles, and security system installers are required to display photographic identification badges identifying themselves as subcontractors for [the plaintiff]. [The plaintiff] provides the installers and technicians with shirts and hats labeled 'Standard Oil' with the understanding that wearing these items could alleviate any customer concern or confusion when they appear at a customer's residence.

"10. Installers and technicians are limited to provide the installation/ service, which [the plaintiff] has sent them to perform. If a customer requests additional work/services, the installer/technician must direct the customer to contact [the plaintiff] directly. Installers/technicians are not allowed to perform additional work/services for said customers without permission and/or direction from [the plaintiff].

"11. The installers and technicians are required to provide the services personally. They are not permitted to subcontract, although they may hire assistants to help them perform the work and may supervise their employees as they see fit. The installers and technicians are not allowed to use casual, pickup or day laborers when providing services in customers' homes.

"12. Each of the installers and technicians has an independent business which provides the same types of services that [the installers and technicians] perform on behalf of [the plaintiff]. Many of the installers and technicians have business cards and advertise their businesses. The heating and cooling equipment installers are required to have box trucks, which are capable of transporting large equipment, such as boilers and oil burners. In addition, many of the installers and technicians earned at least some of their income from sources other than [the plaintiff] during the years in question.

"13. [The plaintiff] makes arrangements directly with the customer regarding all installation and service. It schedules installation and service appointments with all the customers, and then finds an installer or technician who can take the assignment. If they accept an assignment from [the plaintiff], the installers and technicians must perform their work within a designated timeframe which was set by [the plaintiff] and the customer.

"14. Installers and technicians are required to sign . . . contract agreements which [have] been drafted by [the plaintiff]. The agreement requires installers and technicians to maintain a current license and specific insurance coverage(s). The agreements state that the installers/technicians shall at all times exercise independent judgment and control in the execution of any work, job or project they accept.

"15. The installers and technicians are paid a set rate per piece of work. They cannot negotiate the pay rate, which is established by [the plaintiff]. [The plaintiff] requires the installers and technicians to submit their invoices for payment no later than Friday of the week in which they satisfactorily complete their assignments.

"16. Installers and technicians generate a percentage of [the plaintiff's] revenues. This portion of [the plaintiff's] business and profitability is dependent on the installation/service work provided by the installers/technicians.

"17. [The plaintiff] sells service contracts to its customers, which is central and core to its home heating oil delivery service. While [the plaintiff] maintains a staff of employees to perform such services, it 'contracts' with the technicians to perform the same/similar services to its customers. These technicians are subject to the same terms and conditions as the installers in regard to appointments, billing, clothing, work performed and licensing and insurance requirement[s].

"18. The [defendant] previously identified Walter Camp as an employee in a prior audit. [The plaintiff] [reported Camp] as an employee at the time of the [appeals] referee's hearing(s).

"19. The parties stipulated that [§] A-19 in the contract, Right to Fire, would not be a factor in the adjudication of this case.

"20. The contracts contain a restrictive covenant which prohibits the installers from soliciting work from or doing business with any of [the plaintiff's] customers for whom they have performed services.

"21. Five of the installers/technicians, Brian Borchert, Walter Camp, Edward Chickos, Jr., William Parks and Gary Vannart, responded 'yes' to a question on the [defendant's] questionnaire asking if [the plaintiff] has the right to direct how they perform their work. None of the installers or technicians responded 'no' to that question.

"22. [The plaintiff] has instructed the security installers to run an extra wire through its keypads and to use a certain type of conductor. Moreover, the installers can only install the equipment which has been provided by [the plaintiff]. [The plaintiff] provides the technicians with nozzles, strainers, and filters for cleaning oil burners.

"23. Any problems arising between a customer and the installer/technician must be referred to [the plaintiff]. If a customer complains about an installation or service during the warranty period set forth in [the plaintiff's] contract with the installer/technician, [the plaintiff] has the right to send the installer/technician back to the customer site to fix the problem or require the installer/technician to pay for the repair.

"24. [The plaintiff] does not provide the installers and technicians with an employee handbook, and it does not pay for their training or require any specific type of training [with respect to] its products.

"25. The installers and technicians can realize a profit or a loss from their provision of services to [the plaintiff].

"26. While [the plaintiff] has no installers on payroll, it has on occasion used a company employee to install equipment when no installers were available. [The plaintiff] has employees who clean and service its heating and cooling equipment, in addition to the technicians who are at issue in this case.

"27. In his payroll audit report dated July 23, 2009, the [defendant] agreed with [the plaintiff's] classification of certain individuals as independent contractors.

"28. The technicians and installers performed all work outside of the offices of [the plaintiff].

"29. The installers and technicians are free to accept or reject assignments offered to them without adverse consequences.

"30. The installers and technicians were required to return to correct problems found with their work. [The plaintiff] warrants the installed equipment, including parts and labor." (Emphasis omitted.)

[3] We rely in part on the Superior Court decisions because the court acted as an appellate tribunal in those cases and the decisions were not appealed. They thus provide helpful guidance regarding the factors necessary to establish control and direction.

[4] We also noted previously in the decision that the professionals "were utilized only on an as needed, individual lesson analysis basis. There were no regularly scheduled hours of employment. No office space, equipment or supplies were provided by [the plaintiff], with the sole exception of stationery. All work was taken by the artists, writers and photographers to their homes, offices or studios and returned to [the plaintiff] when completed. They had no minimum daily output and were given only one or two assignments at a time. At no time did [the plaintiff] make any promises or commitments concerning the number of lessons to be submitted for their analysis. They were compensated only on the basis of the number of lesson analyses completed. They received no paid holidays or vacations, no overtime pay, and no sick leave or fringe benefits. No social security or federal income taxes were withheld from [the plaintiff's] payments to them. For tax purposes, they received only informational statements ([Internal Revenue Service] Form 1099) showing income received from [the plaintiff]. The

amount paid for each lesson analysis . . . was established by [the plaintiff]." *F.A.S. International, Inc.* v. *Reilly*, supra, 179 Conn. 509–10.

[5] General Statutes § 31-72 provides in relevant part: "When any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive . . . [t]he Labor Commissioner may collect the full amount of any such unpaid wages . . . . In addition, the Labor Commissioner may bring any legal action necessary to recover twice the full amount of unpaid wages . . . and the employer shall be required to pay the costs and such reasonable attorney's fees as may be allowed by the court. . . ."

[6] In accordance with the board's finding that "[t]he parties stipulated that [§] A-19 in the contract, Right to Fire, would not be a factor in the adjudication of this case"; footnote 2 of this opinion; we do not consider this factor, as the courts in *Latimer* and *Daw's Critical Care Registry, Inc.*, did.

[7] To the extent one might argue that our conclusion is not sufficiently deferential to the board's determination that the installers/technicians worked under the plaintiff's control and direction, we disagree. As noted previously in this opinion, our duty is to determine "whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable." (Internal quotation marks omitted.) *JSF Promotions, Inc.* v. *Administrator, Unemployment Compensation Act*, supra, 265 Conn. 417. In the present case, we have concluded that, although some of the board's modified findings are indicative of control and direction, they are greatly outweighed by other findings indicating the absence of control and direction. Accordingly, we do not defer to the board's conclusion under part A of the ABC test because we regard it as unreasonable in light of these findings and persuasive Connecticut precedent to the contrary.

[8] Both parties also cite *Feshler* v. *Administrator, Unemployment Compensation Act*, Employment Security Appeals Division, Board of Review, Case No. 995-BR-88 (December 27, 1988), in which the board concluded that Hartford Hospital was the place of business of the enterprise because the nurses engaged by the enterprise provided services to hemodialysis patients on the hospital's premises. *Feshler*, however, is inapposite because the board found that the enterprise's bookkeeper, clerical and other administrative staff also worked on the hospital premises, thus shedding no light on the question before this court of whether services performed at sites separate and apart from the office locations of the enterprise are places of business under § 31-222 (a) (1) (B) (ii) (II).

[9] In *Stone Hill Remodeling* v. *Administrator, Unemployment Compensation Act*, supra, Superior Court, Docket No. 089398, the trial court upheld the board's decision in *Greatorex* on the ground that the appellant had failed to satisfy parts A and C of the ABC test, and thus did not address part B.

[10] The dissent disagrees with this conclusion because (1) neither the parties, the board nor the trial court relied on § 31-223 (a) in interpreting § 31-222 (a) (1) (B) (ii) (II), (2) the ABC test was crafted by the federal government instead of by the Connecticut legislature, and (3) the test was adopted to satisfy an extrajudicial requirement and not with the intention of creating a harmonious body of unemployment compensation laws in Connecticut. The plaintiff argued, however, that the meaning of a statute is to be ascertained not only from its text, but from its relationship to other statutes. It is thus entirely appropriate for this court to examine related provisions of the statutory scheme concerning employers and independent contractors. With respect to the fact that the ABC test was crafted by the federal government and adopted to satisfy federal requirements, these circumstances do not constrain the court's ability to examine related statutes but serve as an incentive to ensure that, in the absence of federal guidance, the court construes the test in a manner consistent with the underlying objective of Connecticut's existing statutory scheme.

Finally, to the extent the dissent concludes that, even if it accepted our interpretation of "places of business" as meaning " 'premises under [an] employer's control,' " the plaintiff in the present case still does not satisfy part B of the ABC test, we disagree. The dissent reasons that, because the plaintiff's customers have authorized the plaintiff to enter their homes to provide various services, including installation services, the plaintiff exerts dominion and control over the premises to the extent necessary to provide those services. This conclusion is incorrect. The plaintiff has no dominion, control, leasehold interest or any right other than a license to enter the premises for the purpose of performing the services. Customers thus may direct the plaintiff's employees or contractors to leave the premises at any time. See *State* v. *Allen*, 216 Conn. 367, 380, 579 A.2d 1066 (1990) ("A

license in real property is defined as a personal, revocable, and unassignable privilege, conferred either by writing or parol, to do one or more acts on land without possessing any interest therein. . . . Generally, a license to enter premises is revocable at any time by the licensor." [Citation omitted; emphasis omitted; internal quotation marks omitted.]). Consequently, the plaintiff cannot be said to have dominion and control over the premises when its independent contractors perform services at the homes of the plaintiff's customers.

[11] We thus need not address the plaintiff's claim under part B of the ABC test that the services of its independent contractors were performed outside the usual course of its business.